**E. H. HOLCOMB, Jr., Plaintiff-Appellee,**

**v.**

**CESSNA AIRCRAFT COMPANY, and Continental Motors Corporation, Defendants-Appellants.**

No. 29871.

United States Court of Appeals, Fifth Circuit.

March 2, 1971.

I

*The Case Against Cessna*

Edward M. Waller, Jr., Fowler, White, Gillen, Humkey & Kinney, P. A., Tampa, Fla., for Cessna Aircraft Co.

John T. Allen, Jr., Harrison, Greene, Mann, Davenport, Rowe & Stanton, St. Petersburg, Fla., for Continental Motors Corp.

F. Ronald Fraley, Richard G. Davis, of Shackleford, Farrior, Stallings & Evans, Professional Assn., Tampa, Fla., for plaintiff-appellee.

Before GEWIN, COLEMAN, and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge:

Cessna Aircraft Company and Continental Motors Corporation appeal from judgments rendered against them upon jury verdicts in a suit founded upon alleged manufacturers' defects in a Cessna 310K airplane and its twin engines. As to Continental, we reverse with directions to dismiss the complaint. As to Cessna, we reverse and remand for a new trial as to certain specified items.

In May, 1966, E. H. Holcomb, the owner of a Cessna 310 airplane, contacted Ray Umbough about the purchase of a new Cessna. Umbough suggested that Holcomb write to Skyways Air Credit of Ogden, Utah, a Cessna dealer, outlining his desires. The upshot of the matter was that Holcomb bought a Cessna 310K from Skyways on May 18, 1966, and this litigation was born. For the 310K Holcomb traded his old plane at a value of $31,000 and paid $41,279 in cash, fixing the value of the new 310K at $72,279 as between the parties. The new plane was in Wichita, Kansas, when purchased and was ferried to Crowley, Louisiana, for delivery.

The factory warranty was for all necessary repairs and replacements of *only* factory parts at no cost to Holcomb.[1]

Difficulties with the 310K began on the day of delivery. That same night it was discovered that the amplifier for the omni, a part of the electronic system, was missing. When confronted with this information, the man who ferried the plane assured Holcomb that the amplifier would be mailed to him. This was satisfactory, so the plane was then flown to St. Petersburg, Florida. On this flight

1. CESSNA WARRANTY
The Cessna Aircraft Company (Cessna) warrants each new aircraft manufactured by it, including factory installed equipment and accessories, and warrants all new aircraft equipment and accessories bearing the name "Cessna", to be free from defects in material and workmanship under normal use and service. Cessna's obligation under this warranty is limited to supplying a part or parts to replace any part or parts which, within six (6) months after delivery of such aircraft or such aircraft equipment or accessories to the original retail purchaser or first user, shall be returned transportation charges prepaid to Cessna at Wichita, Kansas, or such other place as Cessna may designate and which upon examination shall disclose to Cessna's satisfaction to have been thus defective.

The provisions of this warranty shall not apply to any aircraft, equipment or accessories which have been subject to misuse, negligence or accident, or which shall have been repaired or altered outside of Cessna's factory in any way so as in the judgment of Cessna to affect adversely its performance, stability or reliability. This warranty is expressly in lieu of any other warranties, expressed or implied, including any implied warranty or merchantability or fitness for a particular purpose, and of any other obligation or liability on the part of Cessna of any nature whatsoever and Cessna nether assumes nor authorizes any one to assume for it any other obligation or liability in connection with such aircraft, equipment and accessories.

all of the radios "went out". The plane was taken to Bay Air in St. Petersburg —Clearwater, where one of the radios was returned to a serviceable condition at a cost of $4.38.

Shortly thereafter, Holcomb flew his plane into Lakefront Airport in New Orleans. While there he had Pan Air check out the electronics equipment. The check reflected that all the master switches had shorted and had burned up the radios and mute relays. Pan Air repaired the damage at a cost to Holcomb of $30.90, for which he was reimbursed by Skyways.

He next sent the plane to Boise Aviation, Inc., of Boise, Idaho, to have a glide slope installed, which Holcomb contended should have been on the plane when delivered. The cost of this was $444.52, for which Holcomb was not reimbursed.

Within a couple of months of delivery Holcomb discovered that one of the 310K wing tanks leaked. The F.A.A. will not approve a plane with a leaky fuel tank as airworthy. Holcomb inquired at Pinellas Aircraft, Inc. as to the price of having the tank replaced and was told that it would cost $1,225. Pinellas stated that he would have to pay for the tank, but that Cessna would reimburse him. Holcomb did not agree to this and contacted Cessna, which sent the tank in about two months. Cessna paid $1,224 for the tank and Holcomb paid $139.81 for the expenses of replacing the tank.

Approximately two or three months after delivery of the 310K the spinner on the propeller cracked as Holcomb was bringing the plane in to land. The spinner fits over the center of the propeller and directs air into the cooling system. If the spinner does not work properly, the engine can burn up. However, this incident, as stated, occurred at landing and not in flight. An inspection showed that the spinner was cracked all the way around, about four inches from where it was bolted to the propeller. Holcomb grounded the plane until the spinner could be replaced. Cessna sent a new spinner within ten days. Holcomb was given credit for the cost of the spin-

ner, $55.83, and was charged $29.95 for transportation and labor.

The next thing to go out of commission was the exhaust stack, which burned off right at the engine, allowing excessive heat to go through the cowling. This could have caused a gasoline explosion. The exhaust stacks were repaired in August, 1966, and this resulted in a claim on Cessna by Holcomb of $83.45, which included the rent on a single-engine plane while the 310K was being repaired. In October, 1966, Holcomb had heli-arc welding done on the exhaust stacks and claimed $38.08 from Cessna. Subsequently, new exhaust stacks were ordered. Cessna credited Holcomb with $301 for the new exhaust assembly and he paid $248.68 for labor and transportation.

Also, in October, 1966, Holcomb received a bulletin from Cessna which stated that there should be a curtain under the nose wheel of the 310K. This curtain was designed to keep water out of the electronics which are placed around the nose wheel. The curtain was installed and Holcomb was charged $118.64. He claimed that Cessna was supposed to supply the curtain, free.

At the trial Holcomb and Cessna agreed that the *total* repair expenses *possibly chargeable* to Cessna could not exceed $1,669. This figure was accepted as the maximum but did not include damages for the engines, an item to be discussed in the case against Continental.

The only other evidence offered by Holcomb against Cessna related to his trade of the Cessna 310K for a Cessna Sky Knight. After troubles with the engines on the 310K, Holcomb decided to trade for a Cessna Sky Knight in February, 1967. He traded the 310K and $25,000 for the Sky Knight. He claims that by this trade he was damaged to the extent of $25,000.

On the foregoing evidence, the jury returned a general verdict against Cessna in the following form:

For engines, nothing.

For other "proved expenses", (quotation marks supplied) $32,077.47.

By agreement of plaintiff, the judgment on the verdict was amended to allow recovery against Cessna individually for $6,148.89, and against Cessna and Continental, jointly and severally, for $25,928.58.

## II

### The Case Against Continental

The case against Continental deals solely with allegedly defective engines on the Cessna 310K. These engines, manufactured by Continental, carried a warranty for 180 days or 200 hours, whichever came first. The warranty covered defects in material and workmanship and was limited to repair or replacement of parts. It did not cover labor charges on any engine that was repaired or altered outside of a Continental Motors Corporation factory to the detriment of the engine. The warranty expressly stated that it was in lieu of all other warranties, expressed or implied.

There was no trouble with the engines until the second 100 hour check. One hundred hour checks are required by the F.A.A. [for every 100 hours of flying time]. The checks consist of stripping the airplane almost completely down. If everything checks out, the plane is declared airworthy and this information is registered in the engine logbook. The Cessna 310K had its first inspection at the expiration of 80 hours elapsed flying time and was declared airworthy.

The second 100 hour check was begun in November, 1966, at Tropical Aviation, Inc., of Clearwater, Florida. The tachometer showed 182 hours. The engine compression in all cylinders was found to be low. The number 4 cylinder on each engine registered 35 pounds. Compression is pounds per square inch on the piston,[2] and it is checked by removing the sparkplug, inserting an airhose, and injecting either eighty or a hundred pounds of air into the cylinder. When this is done a gauge measures the amount of leakage in the cylinder. If the leakage is in excess of 25%, the F.A.A. regulations state that the internal condition of the cylinder should be checked. However, the F.A.A. has no mandatory standard for engine compression and only sets the 25% figure as an advisory. The plane cannot be grounded for low compression. Since the number 4 cylinder on each engine of the 310K showed a compression reading of 35 pounds, these cylinders were pulled. Upon inspection, a discoloration was found on the cylinder wall, and there was a buildup of carbon on the valves. All witnesses, except James Matthews, the regular pilot for the 310K, testified that this was due to overheating the engines. *No one testified that there was a manufacturing defect.* The most common ways to incur overheating damage are by leaning the fuel improperly or by failure to maintain proper flight altitude. Either instance is due to pilot error. Leaning is a practice used in the operation of fuel injected engines, such as those on the 310K, and is controlled by the pilot. The 310K has a manually operated exhaust gas tem-

---

2. After Mr. Holcomb traded the 310K, it was subjected to the following inspections, with the results indicated:

| | |
|---|---|
| February 23, 1967. | 206.8 hours, compression good. |
| May 8, 1967. | 314 hours, compression average. |
| June 17, 1967. | 398 hours, compression normal. |
| November 17, 1967. | 591 hours, overhauled, cylinders and pistons, inspected for ring size according to manufacturer's specifications. Excessive ring, piston and piston groove wear. Cylinders reconditioned and reinstalled. Some pistons replaced. All rings replaced. Inspector was of the opinion that the wear was caused by leaning. Inspector found no manufacturer's defects in the cylinders or pistons. |
| February 16, 1968. | 692 hours, airworthy. |
| June 11, 1968. | 825 hours, airworthy. |
| September, 1968. | 1000 hours [180,000 land miles] new engines installed. |

perature analyzer (EGT), which the pilot uses to adjust the mixture of fuel and air to flight altitude. This is what is called "leaning" the fuel. An improper use of the EGT could result in the plane being flown at too lean a mixture for its altitude, causing the engine to overheat. All testimony concerning the cylinders, except that of Matthews, attributed the over-heating problem to improper leaning. Matthews denied that he improperly leaned the engines. He did testify that Jim Morton, another pilot, flew the plane for the two weeks prior to the second 100 hour inspection. Morton was not called as a witness.

On January 16, 1967, Robert Paquin, regional service manager for Continental for twenty-eight years, inspected the cylinder and piston of Holcomb's 310K. He found an overheated condition, resulting in discoloration and excess carbon. Inspection of the piston showed a clearance of $11/1000$ of an inch, $3/1000$ in excess of that to be preferred. Paquin said this variance had no bearing on safety and should not have been noticeable, that the increase in clearance was caused by an overheated condition which resulted from improper leaning. Matthews had testified earlier as to how he leaned the engine, and Pacquin explained why this was incorrect. Truman Palmer, an F.A.A. mechanic, accompanied Pacquin on his inspection and also testified to the overheated condition.

Holcomb requested that Paquin replace the engines but Paquin told him that Continental would only give him a new piston and a set of rings. Even though this was unsatisfactory to Holcomb, he had the number 4 cylinder in the left engine reinstalled with a new piston and new rings, which resulted in a cost to him of $119.42 for parts and $186.90 for labor. The plane was then flown for an hour *and all the gauges registered normal.* The plane, therefore, was declared airworthy. At different times (up to 500 hours) after the installation of the new piston the engines were inspected, and were always found to be satisfactory. No one present at the dis-

assembly of the plane ever testified that there was a manufacture's defect. Almost all stated, however, that there was an overheated condition which would be due to pilot error.

There was certain testimony from Robert Paquin that engines similar to those on the 310K were having overheating problems, and numerous engines had been burned up. These engines were on planes owned by the military at Fort Rucker. However, there was testimony that these engines were subjected to strenuous military aircraft training procedures for which they were not designed. Also, they were on Beech Barons, not 310Ks.

Even though the plane was operating normally and had been declared to be airworthy after the piston was installed, Holcomb decided to trade the Cessna 310K for a used Cessna Sky Knight. He traded with Robert Cardinal, the Cessna dealer in Tuscaloosa, Alabama. At the trial, Cardinal testified that the Sky Knight was worth $100,000, or a little less, as of the date of the trade. Cardinal said the 310K would be worth $70,000. Holcomb paid $25,000 difference between his plane and the Sky Knight. On this basis, there would have been no loss to Holcomb, but, in any event, it is to be noted that Holcomb was not trading for a new 310K, but for another type plane. If the 310K was worth $72,000 new, it had been depreciated by 32,000 land miles of flight.

Eugene Delaphena, former president of Pinellas Aircraft, testified that a 310K comparable to Holcomb's was worth about $50,000 and a Sky Knight with comparable equipment would be worth from $55,000 to $60,000. On this basis, Holcomb's loss on the trade could have been as much as $20,000. It is to be noted that Delaphena downgraded the value of the Sky Knight by $50,000 and downgraded the value of the 310K by $20,000, compared to Cardinal's appraisal.

Using the evidence set forth above Holcomb asked for $306.32 against Con-

tinental for repair bills and $25,000 allegedly lost in the 310K—Sky Knight trade. To this the jury responded with a general verdict against Continental in the following form:

For engines, $2,223.70.

For other general expenses, $25,928.58.

These figures were carried forward in the amended judgment, except that Continental's liability for general expenses was rendered joint and several with that of Cessna.

### III

### *The Decision*

The District Court held, and the parties agree, that the liability of the appellants, if any, is to be governed by Kansas law. Kansas adopted the Uniform Commercial Code on January 1, 1966. The plane was purchased May 18, 1966.

Continental says that it could not have been liable to Holcomb because (1) there was no privity of contract with him and Holcomb sued for economic loss rather than for personal injury; (2) the express warranties issued by both Cessna and Continental specifically excluded implied warranties; (3) Holcomb failed to prove a manufacturer's defect in the 310K engines at the time of sale; and (4) by its express warranty, the liability of Continental was limited to the cost of parts.

We have concluded that Point 3 is decisive, negating the necessity for passing upon the others.

▬ It is not to be doubted that Holcomb had the burden of proving the existence of a defect in the engines on the date of sale, i. e., May 18, 1966. See United States Rubber Company v. Bauer, 8 Cir., 1963, 319 F.2d 463, 466 [a case remarkably like this one, although it involved a broken, one year old, belt on a combine, opinion by J. Blackmun]. Of course, the existence of such a defect may be shown by circumstantial evidence, but the verdict may not rest on guess or speculation, United States Rubber Company v. Bauer, *supra*.

We are here dealing with engines which revealed no defect upon inspection after operating for 80 hours [about 14,000 air miles]. No difficulty appeared until the second check, 182 hours [over 30,000 miles]. Low engine compression was the problem, caused by an overage of 3/1000 of an inch in the preferred clearance between the walls of one of the piston ring grooves. The number 4 cylinder was reinstalled and a new piston and set of rings were placed in the left engine. The plane was then flown for an hour, all gauges normal, no oil leaks and then pronounced airworthy by an F.A.A. mechanic. Subsequent checks to 591 hours revealed normal or average compression and no lack of airworthiness. At 591 hours, the cylinders were reconditioned and reinstalled. Some pistons and all rings replaced. The plane then flew another four hundred hours before new engines were installed. No F.A.A. inspector (for 1,000 flying hours) noted a manufacturer's defect in the engines.

Only one witness made any effort to attribute the condition at the 182 hour inspection to a defect in manufacture. This was the regular pilot of the 310K, Mr. James Matthews. He testified as follows:

"Q. What does that—you have an opinion, then, as to what the cause would be?

A. I would say that it would revert back to the manufacturer."

However, on cross examination, Matthews testified as follows:

"Q. Right, Now, by the same token, sir, you have testified in this case that Continental Motors is responsible in the manufacture of that piston for a defect?

A. I didn't say it was a defect.

Q. Well, what is it?

A. I don't know what it is.

Q. Well, now, as I understand it, now, have you not told this jury that it was due to faulty manufacture of that piston?

A. I didn't say that it was faulty manufacturing. You asked me what caused this in the engine. I don't know what caused it.

Q. You don't know what caused it?

A. No. I only know that the cylinder did not indicate an overheating problem.

Q. And that is as far as you go; right?

A. Yes, sir.

Q. You don't venture an opinion that Continental improperly manufactured this piston?

A. There is a problem in it someplace, but I don't know what it is.

Q. Well, please, let's be definite now, because I understand that you gave an opinion on direct examination. If I am incorrect, I want you to tell His Honor and the jury. Now, is it your opinion that Continental Motors was responsible in the manufacture of that piston for the condition that you found, this hair of difference in the tolerance?

A. They are responsible for the manufacture of that piston, I guess.

Q. Did they cause that difference in the tolerance?

A. *I imagine that extra tolerance wore in there.* (emphasis added).

Q. It wore in there?

A. Yes, sir—I assume. I don't imagine they would put a piston in there that was machined out of tolerance.

Q. Well, I think you understand how important that is, so I want you to be specific about it. Your testimony then, as I understand it, is that it was not in the manufacture of the part, but it was due to wear; is that correct or incorrect?

A. *I would assume that it was due to wear."* (emphasis added).

So, we have a witness who first said that the condition complained of "would revert back" to the manufacturer, but he did not say why or for what reason this was so. Later, this same witness declined to say that "it was a defect" or that it was due to "faulty manufacturing" and concluded by saying twice that he imagined or assumed that the extra tolerance "wore in there" or was due to wear".

■ In the absence of proof of a defect in an article on the date of delivery, the manufacturer thereof may not be held liable on the theory of implied warranty, United States Rubber Company v. Bauer, *supra.*

■ In view of the condition of the engines at the 80 hour check and the performance of the engines both before and after the 182 hour check, in view of the uniform failure of all the experts to detect a manufacturer's flaw in the engines at any time during 1,000 hours or 180,000 land miles of operation, in view of the failure of Pilot Matthews to give any explanation or reason for ascribing the condition to a manufacturer's defect, and in view of his ultimate concession that the extra tolerance was probably due to wear, we are inescapably driven to the unavoidable conclusion that as to the engines the evidence for the plaintiff simply failed to raise an issue for submission to a jury on the question of implied liability.[3]

It necessarily follows that the motion for directed verdict on behalf of Continental Motors should have been sustained.

3. The trial court granted a directed verdict for Continental on the issue of express warranty and there is no appeal from that action.

In diversity cases, evidence, in order to warrant submission to a jury, must present something more than a theory which will permit speculation and it must be something more than a mere scintilla, Firemen's Insurance Company of Newark, New Jersey v. Robbins Coal Company, 5 Cir., 1961, 288 F.2d 349, cert. denied 368 U.S. 875, 82 S.Ct. 122, 7 L. Ed.2d 77. See, also, Schrader v. Prudential Insurance Company, 5 Cir., 1960, 280 F.2d 355; Hogan v. United States, 5 Cir., 1963, 325 F.2d 276; Herron v. Maryland Casualty Company, 5 Cir., 1965, 347 F.2d 357; Geddes v. Daughters of Charity of St. Vincent DePaul, Inc., 5 Cir., 1965, 348 F.2d 144; Colonial Refrigerated Transportation, Inc. v. Mitchell, 5 Cir., 1968, 403 F.2d 541; Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365.

A different decision is not warranted by proof that there was difficulty in similar engines in other aircraft used for rigorous military training. As to that item the undisputed proof showed that in this type of operation the engines were put through full power stalls, slow speed plays, and the planes had been winterized as for operations at 55 or 60 degrees below zero. The undisputed proof further showed that upon correction of these procedures the engines lasted for a phenomenal length of time.

We now consider the case as to Cessna.

We first confront the question of whether Cessna's written warranty (copied in Footnote 1) was legally the sole warranty between the parties. The warranty so states, in the following language, "This warranty is expressly in lieu of any other warranties, express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and of any other obligation or liability on the part of Cessna of any nature whatsoever. * * *" The trial judge ruled that the express warranty did not bar Holcomb's action in implied warranty. As to the Cessna warranty, Mr. Holcomb testified that he had purchased about four different models of Cessna aircraft and "I believe you will find all their warranties the same", although he would not have accepted the airplane under any circumstances relying on "200 hours".

We think the point is governed by K.S.A. 84–2–316(2) which provides as follows:

"Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'there are no warranties which extend beyond the description on the face hereof.' "

The Kansas Comment to Section 84–2–316 reads as follows:

"This section [Section 84–2–316] defines the circumstances which are operative to limit warranty liability. Subsections (1) and (2) recognize the right of the seller to contract against warranty liability through appropriate disclaimer provisions. The policy of the Code, however, is to deny effect to disclaimer language which is inconsistent with an express warranty and to permit exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise." 7 K.S.A. page 48.

Kansas adoption of the Uniform Commercial Code is so recent that, to our knowledge, there are no Kansas decisions defining "conspicuous" or prescribing the requirements of the term. Section 1–201 of the Uniform Commercial Code reads:

"A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. * * * Language in the body of a form is

'conspicuous' if it is in larger or other contrasting type or color."

Examination of a photostatic copy of the warranty (in the record) promptly reveals that the warranty form is printed in the same size type throughout. We hold that the requirement of conspicuosity was not met.

The Kansas Comment states, however, that implied warranties are permitted by "other circumstances which protect the buyer from surprise". The Kansas decisions are equally silent as to what may amount to "other circumstances which protect the buyer from surprise". Cessna says Holcomb's admission that he had owned four Cessnas and that all the warranties were alike demonstrates that he was protected from surprise. It is further contended that Holcomb's initials (which he neither admitted nor denied) on a letter received from Skyways at the time of delivery indicated that Holcomb could not have been surprised. We think, however, that these defenses raise issues of fact and require submission to a jury under appropriate instructions after full development of the evidence on well defined issues.

We have already held that the evidence wholly failed to demonstrate any defect in the engines at the time of delivery and that the trial court should have directed verdicts for the defendants in that regard. Alleged engine defects, therefore, are subject to no further litigation.

As to the other defects in the Cessna, the case should be retried consistently with what has been said herein. The verdict against Cessna is incapable of separation as to that part attributable to engines and that part, if any, attributable to other defects.

The judgment against Continental Motors is reversed, with directions to dismiss the complaint with prejudice.

The judgment against Cessna is reversed and remanded for further proceedings consistent herewith.