**EMPACADORA DEL NORTE, S.A., Plaintiff,**

**v.**

**STEINER SHIPYARD, INC., a corporation, Burford Equipment, a corporation, and Caterpillar Tractor Company, a corporation, Defendants.**

**Civ. A. No. 77–576–T.**

United States District Court, S. D. Alabama, S. D.

April 25, 1979.

---

Charles J. Fleming and Douglas L. Brown, Mobile, Ala., for Empacadora Del Norte, S. A.

Robert H. Smith, Mobile, Ala., for Burford.

J. W. Goodloe, Jr., Mobile, Ala., for Steiner.

William H. Hardie, Jr., Mobile, Ala., for Caterpillar.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

DANIEL HOLCOMBE THOMAS, District Judge.

The M/V SETECA and M/V BOY LAGUNA, owned and operated by Empacadora Del Norte, were brought to Steiner Shipyard for repairs and for conversion from a shrimp trawler to a lobster boat which included the construction of a top house and installation of new engines manufactured by Caterpillar Tractor Company and sold by Burford Equipment Company. As to the SETECA, plaintiff, Empacadora, claims damages for delay of construction, overcharges in the cost of construction, the instability of the vessel, the presence of sand in the engine and the presence of a misplaced ferrule in the engine block. As to the BOY LAGUNA, plaintiff claims damages for the delayed completion of the work and instability of the vessel.

The matter came to trial on the 5th day of February 1979, and was taken under submission on March 12, 1979. Based on the testimony having been taken before the Court without a jury, and having considered all the pleadings, evidence and demeanor of witnesses, the Court makes the following:

### FINDINGS OF FACT

1. Empacadora Del Norte, S.A. (Empacadora) is a Panamanian Corporation with its principal place of business in San Juan, Puerto Rico, and at all material times was the owner and operator of the SETECA and BOY LAGUNA.

2. Steiner Shipyard, Inc. (Steiner) is an Alabama Corporation with its principal place of business in Bayou La Batre, Alabama, and at all times pertinent was engaged in the business of building, repairing, and converting fishing vessels.

3. Caterpillar Tractor Co. is a California corporation with its principal place of business in Peoria, Illinois, and at all material times was engaged in the design, manufacture, distribution, sale and repair of marine engines.

4. Burford Equipment Company is an Alabama corporation with its principal place of business in Montgomery, Alabama, and at all material times was engaged in the sale, distribution, and installation of Caterpillar marine engines aboard vessels.

### THE INITIAL NEGOTIATIONS

5. Empacadora owns and operates a fleet of 27 fishing vessels in Central America and employs over 500 people. Temis Ramirez de Arellano (Ramirez) is the chief executive officer and principal owner of Empacadora.

6. At some point prior to August 1976, Ramirez met with certain of his operating personnel concerning two steel sister fishing vessels owned by the Company, the SETECA and the BOY LAGUNA. A decision was made to replace the main engines with new ones, modify and rearrange the main pilothouse in order to provide larger crew accommodations for lobstering and install a house on top of the main pilothouse for the captain. Keihachi Takeyama (Takeyama), Empacadora's top captain, had previously observed a fishing vessel in Mexican waters with such a top house and was the individual in the Empacadora organization that developed the top house idea.

7. At approximately this same time Ramirez was interested in increasing the size of his fleet and learned that certain boats owned by the State Boat Corporation were for sale. These boats were located at Steiner's yard in Bayou La Batre, Alabama. Accordingly, Ramirez came to Bayou La Batre and met Russell Steiner, the president and owner of the shipyard. Although Ramirez was not interested in the two boats offered for sale, he discussed with Steiner the possibility of performing the repairs and modifications with respect to the SETECA and the BOY LAGUNA and the two met on several subsequent occasions and generally worked out their arrangements as to cost and the anticipated work to be performed. Ramirez also met with Chuck Castro, a salesman for Burford Equipment Company of Mobile, and negotiated a purchase with respect to the new Caterpillar engines.

8. The initial negotiations contemplated replacement of the main engines and their keel coolers, sandblasting and painting, rearrangement of the main pilothouse for crew quarters, fabrication and installation of a top house and other work of a basically cosmetic nature. Takeyama had previously prepared a number of drawings, complete with dimensions, showing exactly how the main pilothouse was to be rearranged and detailing the profile, location, configuration and interior arrangement of the top house. Ramirez furnished these drawings to Steiner and instructed him to fabricate the same in accordance with Takeyama's drawings and instructions.

9. Both Steiner and Ramirez agreed that the work would be performed on a "cost-plus" basis, the agreement being that Ramirez would pay for labor on the basis of cost multiplied by a factor of 2.3 and for material on the basis of cost multiplied by a factor of 1.2. Steiner explained to Ramirez that his entire payroll was handled by a bank operated data processing system and that computer printouts were available on a weekly basis to show the actual cost to date of any given job.

10. For the same reason that Steiner was unable and unwilling to give a fixed price, viz: uncertainty with respect to the extent of the work, Steiner did not agree to perform the work in any fixed time frame.

## CLAIMS AGAINST STEINER FOR DELAY

11. The SETECA and the BOY LAGUNA arrived in Bayou La Batre on August 2, 1976, accompanied by Takeyama and several other employees of Empacadora. Initial observation of the two vessels did not reveal anything out of the ordinary other than two very weathered fishing vessels. However, when the SETECA was hauled out of the water and sandblasting operations were commenced, it was discovered that her hull was badly "eaten up" with electrolysis. The initial electrolysis problem was found to have severely affected the welds in the area of the chines which necessitated that all old welds be gouged out and re-welding accomplished. This was the first of many unexpected problems and events that increased the time, the cost and the extensiveness of the work. Many of these problems and events related to the condition of the boats and many were hidden or went undetected until the workers started to clean, blast, cut or remove the item in question. As the keel coolers were being removed and the hull sandblasted, the electrolysis problem was found to be so serious that huge sections of the hull had to be removed and replaced. The pressure from both water and sand hoses actually

blasted holes in these weak and deteriorated hull sections. In fact, a new plate approximately five feet wide and forty feet long had to be fitted and installed on each side of the keel. In order to remove portions of the hull in the area of the fish hold it was necessary to first remove cement from the bottom of the fish hold. Removal in the area of the engine room required bilge cleaning to remove as much oil residue as possible. Once accomplished, the plate in question had to be burned away from the frames. The burning operation had the effect of causing the rust and remaining oil residue to catch fire, which required the presence of smoke blowers in the hull and one or more men standing fire watch. Despite the blowers, smoke accumulated to the extent that the workers were prevented from working inside the hull for more than ten minutes at a time. Once the plate was removed, it was discovered that the frames themselves were badly rusted and deteriorated and many had to be replaced and refitted. Work of this nature was additionally retarded and complicated by the fact that much of it had to be preceded by cleaning. The BOY LAGUNA was found to be in a similar condition with similar problems.

12. Ramirez continued his interest in acquiring additional vessels from the State Boat Corporation and in August 1976, Steiner accompanied him to Morgan City, Louisiana, for the purpose of inspecting two other boats that were for sale (hereinafter referred to as the State Boats). Ramirez decided to purchase these two vessels and discussed with Steiner the prospects of hauling out, blasting and painting each vessel and extending the wall of the main pilothouse of each out to the bulwarks (to aid in lobstering). Steiner explained to Ramirez that his repair crew was totally occupied with the SETECA and the BOY LAGUNA and that he should have another shipyard perform this work. Ramirez, however, insisted and Steiner finally agreed to perform the work on the State Boats with the understanding that this would delay work on the SETECA and the BOY LAGUNA. Ramirez testified that he clearly understood this. Accordingly, the State Boats arrived at Steiner's yard around the first of September, 1976.

13. After being in Bayou La Batre almost two months, the State Boats left in early November, 1976, under the command of Takeyama and another captain. Although some work was performed to the SETECA and the BOY LAGUNA during this period, it was primarily of a clean up and preparation—get ready nature inasmuch as the primary repair crew was assigned to the State Boats. Some 2752.75 man hours were devoted to the State Boats. Both Ramirez and Steiner agreed that the State Boats created a significant delay in the progress of the work on the SETECA and the BOY LAGUNA. No question has ever been raised as to the reasonableness of the time spent or charges made or services rendered by Steiner on the State Boats and Steiner was paid in full by plaintiff for its work on the State Boats.

14. When the primary repair crew returned to the SETECA and the BOY LAGUNA, more unexpected problems manifested themselves. For example, in blasting the paint off the cap rails and rub rails it was discovered that the steel was so weak from rust and deterioration that the sand blasted holes throughout. This required that a large portion of the rub rails and cap rails be removed and replaced.

15. On another occasion, a broken pin in the mast-boom-outrigger configuration was being repaired or replaced. In the process of holding the outrigger steady with a "cherry picker", the mast was noticed to have a dangerous wobble. Closer examination revealed that the deck area where the mast was affixed was badly rusted and deteriorated, which required removal of the entire mast-boom-outrigger configuration and the installation of "doublers" (new steel plate) over the deteriorated portion.

16. In checking the area of the rudder and the area where the shaft exits the hull, it was necessary to remove and remachine all shafts and journals and replace the bearings. The foundation in the area of the

bearings was badly deteriorated and had to be replaced and the struts in the area of the rudder had to be repaired and strengthened.

17. At some point a determination was made to blast and paint the rear lazerette tank. The rust was so thick inside the tank that sandblasting was found to be completely ineffective. Men with hammers then attacked this thick mass of rust and finally a "needle gun" was employed to remedy the problem. The walls of the tank were so thin that the needle gun penetrated them in spots. The bottom of the tank was also found to be rusted and deteriorated. As a result of this rust and deterioration, the bottom of the tank and large portions of the sides had to be removed and replaced. The lazerette tank affords an excellent example of the problems associated with repairs of this nature. All of the blasting, hammering and needle gun work was rendered futile when it was discovered that large sections of the tank had to be replaced, resulting in much double work. Double work occurred over and over again during the progress of this job because of these unexpected problems.

18. In addition to problems of the nature described above, the evidence demonstrated numerous items were replaced on the vessels, such things as king posts, davits, the vertical braces on the bulwarks, all stay wires on the rigging, the ladder leading to the top of the mast and numerous pipes, pumps and items of machinery.

19. The main pilothouse created some unexpected major problems. It was discovered that the windows in the main pilothouse had been leaking water rather profusely and that the windows were badly rusted and needed replacement. This necessitated not only removal and replacement of the windows, but removal of the rusted edges and consequent enlargement of the openings. In order to remove the deterioration from the exterior wall it was necessary to remove much of the inside paneling, insulation and framing. But this situation with the main pilothouse windows was rendered minuscule when compared to the problem that later developed with the flooring in the main pilothouse.

20. On January 26, 1977, Steiner wrote to Ramirez advising that completion would hopefully be accomplished in three or four weeks. Shortly after this an air pressure test was conducted on the fuel tank of the SETECA below the pilothouse at which time it was discovered that the tank would not hold pressure. It was determined that the roof of the tank, which was also the floor of the main pilothouse, leaked. The repair of this leak necessitated the removal of a two or two and one-half inch cement floor that covered the deck in the main pilothouse. In removing the cement Steiner discovered that water from the leaking windows had not only created the floor-tank rust condition, but had also rusted out the bottom portion of the walls and frames of the main pilothouse. In order to rebuild the floors and bottom portion of the walls of the pilothouse, Steiner had to tear out the entire back wall of the pilothouse. The rusted steel deck was then removed and new plates were brought in with "come-alongs" and cut to fit the pilothouse walls. Simultaneously with the replacement of the steel deck the bottom portion of the pilothouse walls and frames had to be replaced in six foot sections in order to prevent its collapse during the rebuilding process. This condition was also found to exist in the BOY LAGUNA. This work alone was quite time consuming.

21. As these major and unexpected problems were discovered, Steiner would notify Ramirez of the problem and the necessitated repairs and obtain approval for such repairs.

22. In this same general time frame, two mechanical related problems were encountered, both unexpected. Although the main engines were to be replaced, Ramirez decided not to replace the clutches; rather, the clutches were removed from the vessel and sent to Burford to be checked out and adapted to fit a Caterpillar engine. In due course the clutches were returned to the shipyard and installed in the vessel. In an effort to align the clutch with the shaft, one of the Steiner workmen was rotating

the clutch and noticed that a flange in the area of the intermediate shaft was loose. It was then determined that certain bearings or gears in the clutch were completely worn out and had to be replaced or repaired. This item of itself took almost two weeks to repair inasmuch as the work had to be performed in the boat.

23. The auxiliary engine was the subject of another aggravating and time consuming mechanical type problem. Ramirez decided that he wanted Steiner to rebuild this auxiliary engine. After a considerable period of time elapsed due to the nonavailability of parts, a decision was made to replace this engine. The new engine required the installation of a new foundation bed and new piping. Then, when the new engine was installed, Steiner learned that some coupling or similar device rotated in the opposite direction than that of the old engine, which in turn created additional problems and work. This item alone accounted for at least one week of work.

24. Steiner testified that at approximately the same time that he wrote the January 26, 1977, letter to Ramirez, he began to concentrate his efforts on completing the SETECA, first having discussed this with Ramirez. The time records attest to the fact that from approximately that point forward primary emphasis was concentrated on the SETECA. Once the SETECA left, emphasis was shifted to the BOY LAGUNA.

25. After the work was completed and the SETECA had been fueled for her voyage to Honduras, the stability problem manifested itself. This is discussed in more detail below. However, the events following this incident also have a bearing on the question of time. The SETECA left despite this problem, but the BOY LAGUNA remained and a decision was made to correct the stability problem.

26. Clyde Leavitt, a naval architect in Pascagoula, Mississippi, was employed on behalf of Ramirez to investigate and report on the stability of the vessel. After examining the BOY LAGUNA on April 30, 1977, and making some initial calculations, Leavitt wrote Ramirez a letter on May 2, 1977, outlining the alternatives available to correct the stability problem. The alternatives were principally twofold, placing ballast inside the vessel or adding ballast to the keel on the outside. The letter suggests these alternatives. The letter also requests plans and operational data. Approximately one month later, Leavitt again wrote Ramirez stating that since he had received no reply to the previous correspondence and had received no plans or technical data, May 31, 1977, was his first opportunity to become familiar with the underwater form of the hull. In this letter Leavitt sets forth certain recommendations. Steiner testified that the BOY LAGUNA sat idly on his marine railway for some three or four weeks waiting for a decision from Ramirez. The time records indicate that this was the first three weeks or so of June 1977. Finally, Ramirez instructed Steiner to add ballast to the outside keel. This was accomplished by welding many tons of steel strip plate to the keel and adjacent area. This in itself was quite a job and quite time consuming.

27. The delay associated with awaiting a decision from Ramirez with respect to stability affords a striking example of an ever present factor that affected the progress of the work throughout its duration. Because of the initial arrangement between the parties, Steiner's decision making authority concerning these major unexpected problems was nonexistent. Steiner could not undertake to make these often costly and time consuming decisions without authorization from the owner. Often Steiner had difficulty in contacting Ramirez due to his presence in Puerto Rico or Honduras or some other part of Central America. Other times, after contacting Ramirez, Steiner had to wait for a decision, as manifested by the case of the auxiliary engine, the clutch and the stability ballast, to cite three examples. Ramirez admitted that a number of the unexpected items discussed above were of a major nature (electrolysis in the hull, the deck floor in the main pilothouse, the auxiliary engine, the clutch and the stability) that admittedly increased the cost and

duration of the job and that Steiner had no authority to decide what to do about a major item.

28. Weather also played a role with respect to the completion of the work. When the weather was favorable during the months of September and October, the primary emphasis was being directed toward the State Boats. When work resumed on the SETECA and the BOY LAGUNA, winter was at hand and there was testimony of an extremely cold winter in general. January, in particular, was a bitterly cold month in which many normal shipyard activities were curtailed. This is supported by the climatological data presented that contrasts the average versus the actual temperatures.

29. Steiner expended 15,565.75 manhours in connection with the work on both vessels, viz: 7,658.75 hours on the SETECA and 7907.00 hours on the BOY LAGUNA, and supplied much material. Russell Steiner testified that two new vessels could have been built in less than 15,000 manhours, which furnishes some indication of the extensiveness of the work performed to these two vessels.

30. The work initially contemplated was simply sandblasting, painting, engine and keel cooler replacement, rearrangement of the main pilothouse and fabrication and installation of the top house. As discussed at length above, the actual work performed was much, much more extensive than the parties ever contemplated.

31. Ramirez agreed to pay Steiner on the basis of 2.3 times the cost of labor. This is undisputed. The Steiner manhours are documented by a huge box of time cards (made available to the plaintiff but not introduced in evidence) and the computer printouts offered in evidence. The time card data is extracted weekly and furnished to the data processing department of The First National Bank of Mobile, which injects the data into the computer system. The computer printout is then formulated and payroll checks prepared by the bank. Thus the labor cost per employee shown on the computer printout is made the basis of that employee's payroll check.

32. Vincent Bosarge is a former Vice President and Branch Manager of The First National Bank of Mobile who has also worked extensively with the bank's data processing department. Bosarge is now retired from the bank and is employed by Steiner in an administrative role. Bosarge testified that he went through each time card and prepared a weekly recap of hours worked on the SETECA and BOY LAGUNA. He then went through the voluminous computer printout and prepared a weekly recap showing the cost of labor and the total hours worked. Bosarge then compared the time card recap with the computer printout recap and correlated the two recaps for each vessel. Upon reviewing the recaps, correlations and printouts, the Court finds that plaintiff was overcharged $209.85.

33. With the exception of $209.85 overcharged to plaintiff, this Court finds the hours shown on the computer printouts to be adequately documented by the shipyard records and the extensive work that was performed to each vessel. This Court also finds that the time expended in the performance of the work was not unreasonable under the circumstances outlined above.

### THE STABILITY ISSUE

34. After completion of the work and while being fueled for her return voyage to Honduras, Steiner and Ramirez observed that the SETECA developed a somewhat severe list. It was at this point that the stability problem manifested itself. Steiner told Ramirez that he should allow the shipyard to correct this condition, but Ramirez refused stating that the repairs had taken too long and that he wished to put the vessel back to work. The SETECA left for Honduras. Subsequently, the services of Clyde Leavitt, a naval architect with extensive qualifications and experience, were obtained and suggestions were made with respect to a correction of the problem. These suggestions were carried out by Steiner on the BOY LAGUNA. Later, Ramirez had another shipyard perform the

same work on the SETECA. The suggestions of Clyde Leavitt completely corrected the stability problems and neither vessel has experienced any problems of this nature since.

35. An important factor concerning the stability issue relates to the overall stability of these vessels prior to their arrival in Bayou La Batre. There was conflicting evidence as to whether or not these vessels had stability problems prior to the conversion.

36. Furthermore, despite the conflicting testimony concerning the prior stability condition of these vessels, Clyde Leavitt testified that the SETECA and the BOY LAGUNA possibly had "marginal or deficient stability" before the top houses were added. This conclusion was premised upon the metacentric height of the vessels. Too low of a metacentric height in a vessel has an adverse affect on stability. Leavitt testified that some of the characteristics of a vessel with a metacentric height that is too low would be the propensity of the vessel to roll to a large angle, the fact that the vessel remains heeled at the end of a roll, excessive water on the decks, and a tendency to list excessively when strong helm is applied. The foregoing supports the conclusion that the adequacy of the stability of these vessels was questionable prior to their arrival in Bayou La Batre and that their stability was certainly abnormal.

▮ 37. Nevertheless, Steiner held itself out as a competent shipyard skilled in converting boats for use in lobster fishing. Plaintiff had a right to rely on the expertise of Steiner and had reason to expect a stable seaworthy vessel upon completion of the repairs, regardless of the condition of the boats prior to repairs. The cost plus arrangement was selected because the extent of the repairs was difficult to estimate and it was more flexible for handling problems which might arise after the commencement of the repairs. The stability of the vessels was one such problem which Steiner was under an obligation to correct in order to tender a seaworthy vessel. However, it was plaintiff's decision to re-move the SETECA from Steiner Shipyard and have the stability problem corrected by another shipyard at a later date. Under the cost plus arrangement, plaintiff's decision to remove the SETECA relieved Steiner of its obligation to correct the stability problem on the SETECA.

▮ 38. Plaintiff argues that the stability problem could have been performed more inexpensively had the problem been detected or realized at the beginning of the repairs. However, based on the opinion of Clyde Leavitt, a naval architect, the Court finds that fabrication and installation of the top house followed by stability calculations afforded the best and most practical way to perform a job of this nature. If contacted in advance, a naval architect without any technical data pertaining to the hull would be compelled to prepare hydrostatic curves and lines and to perform numerous measurements and tests, resulting in the expenditure of much time and money. In Leavitt's opinion, it is much simpler and more economical to first install the top house and then perform certain simple tests and add enough ballast to remedy any stability problem. This was the procedure that was ultimately followed by Steiner with respect to the BOY LAGUNA. Therefore, the Court finds that the stability problem was handled in a workmanlike manner and Steiner is not liable for the cost of correcting the stability problem of either vessel.

## REFRIGERATION

39. Several months after the arrival of the SETECA and the BOY LAGUNA, Ramirez told Steiner that he had decided to have a Turbo Marine refrigeration system installed in the vessels. Steiner stated that he would contact Turbo Marine in Tampa and inquire as to whether or not anyone in the Bayou La Batre area could perform the installation. Turbo Marine forwarded its "standard shipyard package" to Steiner, which generally consists of the diesel engine that powers the system plus certain piping and related items. This package does not include certain of the essential components of the system. Turbo Marine instructed

Steiner to install the diesel engine and piping in the vessel, but that the remaining installation must be performed in Tampa. The refrigeration engine is located in the area of the main engine. In order to exchange the main engine, which Steiner was doing under the principle agreement, it was necessary to cut out an existing bulkhead and thus provide a passageway for the exchange of the engines. Once the new engine was installed the opening in the bulkhead was sealed. That is why Turbo Marine forwarded certain components for installation by the shipyard so this could be accomplished while access to the area was readily available. Steiner has never installed the actual refrigeration components as this is always done by Turbo Marine.

40. Upon leaving Bayou La Batre, the vessels went to Tampa for completion of the refrigeration installation. Turbo Marine has outfitted numerous Empacadora vessels in Tampa, both before and after the Steiner repairs. Ramirez claims that Steiner agreed to do all the refrigeration work in Bayou La Batre, that he failed to complete the installation and that therefore Steiner must respond in damages for breach of contract. This Court does not find the existence of any such agreement as claimed by Ramirez.

### SETECA ENGINE DAMAGE

41. The repairs at Steiner included the installation of new engines in the BOY LAGUNA and the SETECA. Plaintiff negotiated directly with Burford Equipment Company for the purchase of the new engines.

42. The Caterpillar marine engine No. D–343, Serial Number 33B7489 (hereinafter SETECA engine) was manufactured by Caterpillar Tractor Company in June of 1975. The SETECA engine was sold to John Fabic Tractor Company, Fenton, Missouri, in August of 1975. The SETECA engine was subsequently sold by John Fabic Tractor Company to Burford Equipment Company.

43. During the initial negotiations Steiner indicated to plaintiff that by using the Steiner account, plaintiff could obtain the shipbuilder's discount on the sales price of the engine. Because of the shipyard discount and because Burford was not familiar with plaintiff and its credit rating the sale of the engines was made directly to Steiner. The engines were delivered to Steiner in December 1976 and were paid for by Steiner out of advances given to Steiner by plaintiff. However, the Court finds that the sales contract was actually between Burford and plaintiff and that Steiner was acting as agent for the plaintiff in the sale paperwork, receipt and delivery of the SETECA engine, including the receipt of the warranty disclaimers by Burford Equipment Company and the limited warranty issued by Caterpillar Tractor Company.

44. On July 9, 1976, Russell Steiner, President of Steiner Shipyard, Inc., executed a machine purchase order on a form supplied by Burford Equipment Company. The machine purchase order stated that the engines were being sold to Steiner Shipyard, Inc. Set off near the center of this one page document in all capital letters is the word "WARRANTY" with three blank lines available for printing in particular warranty information. Beneath this the following language is contained:

"Caterpillar products are sold subject to the terms of the applicable Caterpillar warranty. Copies of the warranty applicable to this purchase order are attached hereto, and the purchaser signing this order acknowledges receipt of the Caterpillar warranties on Forms _____. Machines included in this order are sold without warranty by Burford Equipment Company unless said warranty is set out on the face hereof."

45. In essence, the Caterpillar warranty provided for the provision and replacement of defective parts. Additionally, the Caterpillar warranty expressly disclaimed any other warranties as follows in bold print:

"This warranty is expressly in lieu of any other warranties, express or implied, including any warranty of merchantability of fitness for a particular purpose."

46. Remedies under the warranty were also restricted and the following language is found in the Caterpillar printed warranty:

"Remedies under this warranty are expressly limited to the provision and installation of parts, as specified above, and any claims for other loss or damages of any type (including without limitation) loss from failure of marine products to operate for any period of time, other economic or moral loss, or direct, immediate, special, indirect or consequential damage are expressly excluded.

47. When the SETECA engine was received by Burford Equipment Company, a delivery inspection was conducted by Mr. Gene Manter of Burford. At the time of receipt of the SETECA engine by Burford from the common carrier, all external openings to the SETECA engine were sealed and nothing unusual was noticed by Burford. While the SETECA engine was at Burford a marine gear supplied by the plaintiff was installed under the direction of Gene Manter. Engine oil was most likely placed in the engine at the Burford facility. The engine oil at Burford is delivered to Burford in bulk by tank truck and is then pumped into the engines through a closed system. A pre-delivery inspection of the SETECA engine was conducted by Manter and all external openings were covered and the engine in proper delivery condition. In December of 1976, the two engines in question were delivered to Steiner Shipyard. Virgil E. Johnson, the employee of Steiner Shipyard authorized to receive the engines, signed the machine delivery receipt stating that the above engines and tools had been received in good condition. Johnson recalled that all engine openings were sealed.

48. On April 5, 1977, Phillip "Speedy" Sewell, a 38 year employee of Burford, conducted the sea trial. Before the Caterpillar warranty offered by Caterpillar Tractor Company can be placed into effect a qualified representative of the local dealer has to conduct a sea trial and furnish a delivery service report along with a warranty service registration which is registered in the name of the ultimate user. Sewell noticed nothing unusual in the performance of the SETECA engine during the sea trial. The engine and all its piping and venting and vent hoses, including the marine gear, had been installed by Steiner Shipyard. According to Sewell's delivery service report he inspected the air cleaner element and inlet piping. Sewell stated that in the event any sand or debris were found in the air intake manifold that this would have been cleaned out and the air element reinstalled. Sewell did not have any recollection of finding any sand or debris in the air intake manifold at the time of the sea trial.

49. It is not normal practice for the selling dealer of a marine engine to remove the head of the engine to check for internal conditions within the engines and no such inspection was made by Burford Equipment Company.

50. On approximately April 9, 1977, the SETECA was delivered to the plaintiff by Steiner Shipyard. The vessel left Mobile and traveled to Tampa, Florida, where it was to receive the refrigeration work. On the trip from Mobile to Tampa some problem was detected by the Captain with the marine pressure gauges (not the oil pressure gauges). While in Tampa the Captain of the SETECA called upon the local Caterpillar authorized dealer to make corrections on the gauges. This work was submitted as a warranty claim by the plaintiff and the warranty claim was honored by Caterpillar Tractor Company. Payment for the warranty work was made by Caterpillar Tractor Company to the Caterpillar dealer in Tampa, Florida. At the time the sea trial was conducted, Sewell noted on his installation check list that the alarm and panel gauges were not working but that they were to be repaired by Steiner Shipyard.

51. On the trip from Tampa to Honduras the vessel lost power while it was at sea and upon arriving in Honduras the air intake manifold was found clogged with sandblasting sand. Additionally, the engine was disassembled in August of 1977. The cylinder head was removed and it was discovered that the port side after ferrule of

the number 1 cylinder had been placed in the adjacent lubricating oil drain instead of the proper water hole.

## SANDBLASTING

52. It was undisputed that sandblasting was done to certain portions of the SETECA after the engine had been installed. Plaintiff contends that blasting sand entered an air intake duct on the deck of the SETECA and became lodged in the duct or in the flexible tubing leading from the duct to the engine. The sand was allegedly drawn into the air filter housing of the engine and passed through the filter element into the engine.

53. Virgil Johnson, the yard foreman in charge of the work on the SETECA testified that he personally supervised the work of sealing up the air intake duct prior to doing any sandblasting. He explained that the rectangular goose-neck vent was blocked off by cutting a piece of styrofoam to the shape of the opening, stuffing it into place and sealing the edges with tape. The styrofoam remained in place from the time it was put into the duct initially until it was removed a few weeks before delivery of the vessel.

54. Jackie Pritchett, an employee of Steiner testified that he hooked up the flexible tube to the engine and ran the engine approximately a week before delivery of the vessel. The styrofoam was removed from the duct when this procedure was accomplished and there is no evidence that the styrofoam was ever reinserted.

55. The time records of Steiner indicate that subsequent to the "shipfitting" work done by Pritchett in the engine room, Steiner employees did sandblasting and painting work on the hull of the SETECA. This blasting took place during the week of March 26, 1977, some eight days before delivery of the vessel. Steiner employees explained that often small components such as hatches and davits were sandblasted and painted off the vessel in a special area and then installed on the vessel. They testified that this type work might be designated on the time cards as blasting on the hull of the SETECA. However, this Court finds that the styrofoam taken out of the duct by Mr. Pritchett was never replaced and subsequent sandblasting by Steiner caused sand to enter the duct leading to the air intake system of the SETECA engine.

56. A representative of Burford Equipment Company came to the vessel on the day it was delivered to plaintiff and testified that while he does not recall doing so specifically in this case, it was normally his practice to open the air filter housing and check for the presence of any sand or other foreign matter. He does not recall if there was any sand in this particular air filter housing but is sure that had there been any he would have removed it. He testified that he did not inspect the flexible tubing leading to the deck or the duct itself to determine whether any sand was in it. He then started the engine and performed certain tests on it. He did not thereafter open the air filter housing. It is reasonable to conclude that any sand in the air filter housing was removed by the Burford employee and that other sand remained in the flexible tubing or in the duct itself and that this sand would have been drawn into the air filter housing during or after the sea trials. No one apparently inspected the air filter housing after the engine was started by the Burford representative at the sea trial. It is undisputed from the evidence that it is a deviation from normal shipyard practice to sandblast a portion of a vessel without covering air intake openings and the Court finds that Steiner was negligent in allowing the sand to enter the engine.

## THE FERRULE SEAL

57. On August 9, 1977, the SETECA engine was disassembled at the plaintiff's dock in Puerto Castillo, Honduras. Upon removal of the cylinder head it was discovered that the port side after ferrule on the number one cylinder had been placed in the adjacent lubricating drain instead of the proper water hole.

58. The ferrule in the D343 Caterpillar Diesel Engine is used as a seal between the

engine block and the cylinder head to insure that water circulating between the block and the cylinder head does not leak into the space between the cylinder head and the block.

59. The Court finds that the presence of the water ferrule in the adjacent oil drain hole, although misplaced, did not cause any damage to the SETECA engine. However, under the Caterpillar warranty in question, Caterpillar is liable only for the reasonable cost of the repair of the engine to place the ferrule in the proper water jacket hold and remove the ferrule from the lubricating oil drain hole which is approximately $250.00.

60. The Court further finds that there is no evidence of negligence on behalf of Burford as it relates to inspection of the D343 engine since it is not normal or usual to remove the engine head during pre-delivery inspection and this would have been the only manner in which the misplaced ferrule could have been discovered by Burford.

### DAMAGES

61. The SETECA engine was repaired in Honduras at a cost of $4,254.00 for parts, $930.00 for labor, $250.00 for transportation of parts and approximately $1,500 in expenses for watchmen, surveyors, mechanic expenses and various items used in the repair and cleaning up thereafter. Additionally, the expenses of the surveyor of the plaintiff in conducting his inspection of the engine in Honduras amounted to approximately $1,250.00.

62. Testimony established that the engine had to be rebuilt and that the rebuilt engine was worth from ½ to ¾ the value of the new engine which plaintiff had before the sand was allowed to enter the engine. Since the cost of the engine and installation was approximately $20,000, the Court finds that plaintiff suffered an additional loss of $5,000 due to depreciation of the engine in its repaired condition.

63. The actual repair to the engine took about 12 days but was out of service for 157 days due to difficulty in obtaining parts and allowing interested parties to schedule and attend surveys of the vessel. Of the 157 days, the Court finds that plaintiff could have fished the vessel for 117 days. The Court further finds that plaintiff lost $332.00 per day in profits while the vessel was not fishing for a total loss of $38,-844.00.

### CONCLUSIONS OF LAW

1. While a contract to build a vessel is not within the Admiralty jurisdiction of the United States a contract to repair a vessel is maritime and within the jurisdiction of this court under 28 U.S.C. § 1333. See *New Bedford Dry Dock Co. v. Purdy,* 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922). Accordingly, federal maritime law governs the construction of the agreement. *Booth S.S. Co. v. Meier & Oelhaf Co.,* 262 F.2d 310 (2d Cir.); *Alcoa Steamship Co. v. Charles Ferran & Co.,* 242 F.Supp. 962 (E.D. La.1965).

2. When a contract to repair a vessel does not specify the time for performance the repairs must be completed within a reasonable time. *Glen Cove Marina, Inc. v. The Vessel Little Jennie,* 269 F.Supp. 877 (E.D.N.Y.1967). See also *Todd Shipyards Corp. v. Jasper Electric Service Co.,* 414 F.2d 8 (5th Cir. 1969); 1 *Corbin, Contracts* § 96.

3. The SETECA and the BOY LAGUNA arrived at Steiner Shipyard on August 2, 1976. Steiner originally contemplated that work on the two vessels would be simultaneous and the vessels would be delivered together. However, at least half the work on the BOY LAGUNA was deferred until the SETECA was completed on April 5, 1977. The BOY LAGUNA was delivered on August 8, 1977.

4. While Steiner denied that any fixed time frame was agreed upon, Ramirez testified that initially he was under the impression that the work could be performed in four to six weeks. However, Ramirez admitted that upon discovery of the deteriorated condition of both vessels his initial estimate was inaccurate.

5. In determining what is a reasonable time for performance, several factors are relevant, to wit: (1) the relationship between the parties; (2) the subject matter of the contract; and (3) the standard of practice in the indus ry. See *Glen Cove Marine, Inc. v. Vessel Little Jennie,* supra at 879.

6. The initial negotiations contemplated replacement of the main engines and their keel coolers, sandblasting and painting, rearrangement of the main pilothouse for crew quarters, and fabrication and installation of a top house. The work that was actually required far exceeded the expectations of both Steiner and plaintiff. To begin with, the electrolysis problem was more severe than expected requiring removal of portions of the hull (Findings of Fact No. 11) (hereinafter Findings). The rub rails and cap rails had to be removed and replaced. (Findings No. 14). The mast-boom-outrigger configuration had to be removed and repaired. (Findings No. 15). It was necessary to remove and remachine all shafts and journals in the rudder area (Findings No. 16). The lazerette tank was beyond repair and had to be replaced. (Findings No. 17). It also became necessary to remove the windows and cement flooring of the pilothouse (Findings No. 18, 19 & 20). The clutches on the main engine and repair of the auxiliary engine were an additional source of unanticipated repairs (Findings No. 22 & 23).

7. While the unanticipated repairs prolonged the work there were other extraneous factors which contributed to the delay in completion of the repairs. In addition to a small amount of inclement weather Steiner had to seek authorization from Ramirez concerning the unexpected problems. Authorization was not readily obtainable due to the difficulty in locating Ramirez (Findings No. 27).

8. Repairs were also delayed when Ramirez elected to have Steiner repair the State Boats, knowing that the repair crews on the SETECA and BOY LAGUNA would be used to repair the State Boats (Findings No. 12 & 13).

9. While the repairs did take an unusually long time to be completed, under the circumstances of this case, the Court finds that the repairs were performed within a reasonable amount of time and the cost of the work was not excessive with the exception of $209.85 overcharged to plaintiff.

10. While there was considerable debate at trial over who was responsible for the final design of the top house, the Court finds that in undertaking to add a top house on a vessel Steiner had a duty to tender a stable seaworthy vessel upon completion of repairs. *J. Ray McDermott and Co. v. Vessel Morning Star,* 431 F.2d 714 (5th Cir. 1970). However, in the instant case, since correcting the stability problem after completion of the top house is the preferred method when a fishing vessel and a small shipyard are involved and since plaintiff would have been responsible for the cost of correcting the stability problem under the cost plus arrangement agreed upon by both parties, the Court finds that Steiner is not liable for the cost of correcting the stability of either the SETECA or BOY LAGUNA.

11. When a shipyard undertakes to make repairs aboard a vessel a warranty of workmanlike service arises which is comparable to a manufacturers' warranty of the soundness of its manufactured product. See *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S 124, 76 S.Ct. 232, 100 L.Ed. 133; *Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc.,* 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; *Booth Steamship Co. v. Meier & Oelhaf Co.,* 262 F.2d 310 (2d Cir. 1958); *Alcoa Steamship Co. v. Charles Ferran & Co.,* 242 F.Supp. 962 (E.D.La.1965). The sandblasting operation of Steiner on the SETECA without adequate safeguards to prevent the introduction of sand into the SETECA engine was a breach of its warranty of workmanlike services. Accordingly, Steiner is liable to plaintiff in the amount of $51,928 as set out in Findings No. 64–66.

12. The Court finds that the sand in the engine is responsible for all the engine dam-

age. While the Court believes that it is the better manufacturing procedure not to misplace a water hole ferrule in an oil drain hole, it finds that such misplacement did not cause or contribute to the engine damage complained of by the plaintiff. However, under the written warranty, extended by caterpillar, plaintiff is entitled to recover the cost of replacing the ferrule which this Court found to be $250.00.

13. In regard to claims against Burford for damages caused by the mislocated ferrule, the Court has already found that Burford was not negligent in failing to discover the mislocated ferrule.

14. The Court also finds that the disclaimer language on the purchase order is such that should call attention to the exclusion of warranties and makes it plain that there is no implied warranty offered on behalf of Burford and that the engine was sold subject to the terms of the applicable Caterpillar warranty. See *Holcomb v. Cessna Aircraft*, 439 F.2d 1150 (5th Cir. 1971) cert. denied, 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56.

Judgment in accordance with the above Findings of Fact and Conclusions of Law will forthwith issue.