**PAPER MANUFACTURERS COMPANY, Plaintiff,**

v.

**RESCUERS, INC., f/k/a Arcar Graphics, Inc., Defendant.**

No. 3:97 CV 582 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 19, 1999.

870

Edward A Sullivan, III, Baker and Daniels, South Bend, IN, Albert J Dahm, Baker and Daniels, Fort Wayne, IN, for Zimmer, Inc.

Philip E. Kalamaros, Timothy J. Maher, Edward N. Kalamaros & Associates, South Bend, IN, Edward N Kalamaros & Associates, South Bend, IN, for Paper Manufacturers Company, Perfecseal—A Bemis Company, Bemis Company, Inc.

Don G. Blackmond, Don G. Blackmond, Jr., Doran Blackmond Ready Hamilton and Williams, South Bend, IN, for Rescuers Inc.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court on Defendant's, Rescuers, Inc. (Rescuers), Motion for Summary Judgment. The issues have been fully briefed and this Court has considered same.

## JURISDICTION

Jurisdiction is proper pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds the required amount.

## BACKGROUND

The initial cause of action in this case arose between plaintiff Zimmer, Inc. (Zimmer), a Delaware corporation having its principal place of business in Warsaw, Indiana, and Paper Manufacturers Company (PMC), a Pennsylvania corporation with its principle place of business in Philadelphia, Pennsylvania. Zimmer produces and sells various medical products, one of which is a bone cement powder that is used in orthopedic implant procedures. Sometime in 1994, Zimmer contracted with PMC for it to manufacture packages for this bone cement powder. Allegedly, PMC was aware of the need for sterility due to the end use of the bone cement powder.

Sometime in mid 1994, PMC began purchasing ink from Rescuers (formerly AR-CAR Graphics) to use for printing on the pouches it was manufacturing for Zimmer.[1] PMC began shipping pouches to Zimmer in December, 1994. In April 1995, Zimmer discovered that some of the packages provided by PMC were defective and caused contamination of the bone cement product. Contamination occurred when the packages failed to seal properly and when a chemical in the ink seeped into the bone cement. Zimmer had to recall all of its product and initiated suit against PMC. PMC filed a third-party complaint against its ink supplier. PMC alleged that a chemical "anti-scuff" agent in Rescuers' ink caused the defect and contamination of Zimmer's bone cement and therefore, Rescuers was liable in negligence, strict liability and for breach of contract.

Zimmer and PMC settled their dispute with the assistance of Magistrate Judge Cosby and the original action was dismissed with prejudice on March 17, 1999. Upon consent of the remaining parties, on March 23, 1999, the third-party claim was transferred to Magistrate Judge Robin Pierce for final disposition. Rescuers filed its motion for summary judgment on March 1, 1999 and the Magistrate was working with the parties to resolve the case. Due to Judge Pierce's unexpected death on July 5, 1999, the action was returned to this Court which now addresses third-party defendant's motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together

---

1. Rescuers, Inc., an Illinois corporation with its principal place of business in Minneapolis, Minnesota.

with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993). A thorough discussion of Rule 56 can be found in a trilogy of cases decided in 1986 by the Supreme Court of the United States.[2] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings,

*Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920–21 (7th Cir.1994); *Hughes v. Joliet Correctional Ctr.,* 931 F.2d 425, 428 (7th Cir.1991), nor may that party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994), *cert. denied,* 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995); *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991), *reh'g denied,* 1993 WL 518446. Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–55, 106 S.Ct. 2505.

## CONFLICT OF LAW ISSUES

Initially, the Court must determine whether Indiana, Illinois or Pennsylvania law applies.[3] As a rule, a court in a diversity case must apply the substantive law of the forum in which it sits, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including that pertaining to choice of law. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *American Family Mut. Ins. Co. v. Williams,* 839 F.Supp. 579 (S.D.Ind.1993); *Hubbard Mfg. Co., Inc. v. Greeson,* 515 N.E.2d 1071 (Ind.1987). Therefore, if the laws of more than one jurisdiction arguably are in issue, *Erie* requires the federal court to apply the choice of law rules of the state in which it sits. *Jean v. Dugan,* 20 F.3d 255 (7th Cir.1994) (*citing Klaxon Co.,* 313 U.S. at 496–97, 61

---

**2.** The 1986 Supreme Court trilogy was later reexamined in *Eastman Kodak v. Image Technical Servs.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Eastman Kodak,* however, is that it did not tinker with *Celotex* and *Anderson,* and possibly involves an attempt to clarify *Matsushita.* This view is well-supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Deci-*

*sion of Summary Judgment Motions,* 139 F.R.D. 441 (1992).

**3.** Neither party argues that Minnesota law applies (the principal place of business of Rescuers). Additionally, because the record indicates that the only contact with Illinois in this case is that it happens to be the state where Rescuers is incorporated, this Court finds no basis for applying Illinois law.

S.Ct. 1020); *Hubbard Mfg.*, 515 N.E.2d at 1073. Accordingly, this court will apply Indiana's choice of law rules in making its determination of which state's law governs the substantive issues.

### A. Contract Issues

■ The characterization of the nature of an action bears upon the choice-of-law question. The present action arises from contract, tort and strict liability claims. Formerly, in contract cases, Indiana courts applied the law of the state in which the alleged contract was made or was to be performed. *See Hubbard Mfg., supra; Travelers Ins. Companies v. Rogers,* 579 N.E.2d 1328 (Ind.Ct.App.1991). The focus upon performance, in most instances, resulted in application of the law where the breach took place. That rule was modified, however, to allow application of the law of the state with the most significant contacts to the subject matter of the litigation be applied, regardless of the place of the breach. *W.H. Barber Co. v. Hughes,* 223 Ind. 570, 63 N.E.2d 417 (1945); *Travelers Ins. Companies,* 579 N.E.2d at 1330. The test requires that a court analyze "all acts of the parties touching the transaction in relation to the several states involved" and apply "the law of the state with which the facts are in most intimate contact." *W.H. Barber, supra; OVRS Acquisition Corp. v. Community Health Serv., Inc.,* 657 N.E.2d 117 (Ind.Ct.App.1995), *reh'g denied* (1996) (abandoning the strict *lex loci* rule in contract cases). As formulated by the Indiana Supreme Court, the rule has been stated succinctly as follows:

> The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact.

*W.H. Barber, supra; Eby v. York–Division, Borg–Warner,* 455 N.E.2d 623 (Ind. Ct.App.1983). In determining which state has the "most intimate contact", Indiana recognizes the rule as formulated by the Restatement, Second, Conflict of Laws, § 188 (1971). *Coldwell Banker & Co. v. Karlock,* 686 F.2d 596 (7th Cir.1982); *Sullivan v. Savin Business Machines Corp.,* 560 F.Supp. 938 (N.D.Ind.1983). The applicable section states that "[I]n the absence of an effective choice of law by the parties, the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1969 and App.). If the place of negotiating the contract and the place of performance are in the same state, the local law of that state will usually be applied, except as otherwise provided in §§ 189–199 and 203. *Id.* at § 188(3). Also, in determining any conflicts of law questions with respect to the interpretation or enforcement of contracts, the following factors must be taken into account:

(1) A court, subject to constitutional restrictions, will follow a statutory directive or its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*See* RESTATEMENT (SECOND) CONFLICT OF LAWS: Choice of Law Principles § 6, p. 10 (1969 and App.); *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224 (N.D.Iowa 1995).

■ In this case, the Court has no information regarding the place of negotiating or finalizing the contract. As for the place of performance and location of the subject matter of the contract, the ink was sent to Pennsylvania where it was used on sealable "pouches" that were then sent to Zimmer in Indiana. The end product (pouches containing bone cement) was stored in Indiana. The recall of all distributed bone cement originated in Indiana. The initial suit was brought by Zimmer in Indiana. This Court determines that Indiana law applies to all contract issues.[4]

## B. Tort Issues

■ A modified version of the "significant relationship test" was adopted by the Indiana Supreme Court in *Hubbard*, in the context of determining whether to apply Indiana or Illinois product liability law. *Hubbard Mfg.*, 515 N.E.2d 1071, 1073. Indiana's choice of law rules dictate that when an action arises in tort the trial court must first ask where the last event necessary to give rise to liability occurred. *American Family*, 839 F.Supp. 579. This is the traditional *Lex loci delicti commissi* rule. *Big Rivers Elec. Corp. v. General Elec. Co.*, 820 F.Supp. 1123 (S.D.Ind.1993). Secondly, the court must ask whether the place of the last event bears any connection to the legal action, and if the place of the last event has sufficient connection to

the legal action, that state's law applies and the inquiry is concluded. *American Family*, 839 F.Supp. at 582; *Cox by Zick v. Nichols*, 690 N.E.2d 750 (Ind.Ct.App. 1998), *reh'g denied*. *See Kamel v. Hill–Rom Co., Inc.*, 108 F.3d 799 (7th Cir.1997); *Giffin v. Summerlin*, 78 F.3d 1227, 1230 n. 3 (7th Cir.1996). However, if the place of the last event does not have sufficient connection, the court moves to the third step and considers the place where the conduct causing the injury occurred, the residence or place of business of the parties, and the place where the relationship is centered. *Big Rivers*, 820 F.Supp. at 1125; *Jean v. Dugan*, 814 F.Supp. 1401 (N.D.Ind.1993), *aff'd* 20 F.3d 255 (7th Cir.1994).

■ In the present case, the last event giving rise to liability was the contamination of Zimmer's bone cement which occurred in Indiana. Due to this contamination, Zimmer had to recall all product that was packaged in the PMC pouches labeled with Rescuers' ink. The recall originated in Indiana. Zimmer filed the underlying suit against PMC in Indiana. Thus, the last event giving rise to liability is connected to this legal action. While the contamination of the bone cement ultimately caused loses to both PMC and Zimmer, it is this Court's opinion that Indiana law applies to the tort causes of action.[5]

## DISCUSSION

Rescuers seeks summary judgment in its favor as to all counts of PMC's third-party complaint. Having determined that Indiana's law is the proper choice of law for all issues in this case the Court separately addresses each count of PMC's complaint below.

## I. Count I—Negligence

PMC argues that Rescuers had a duty to provide it with an ink that would not contaminate the bone cement product and

---

4. The Court notes that while it is arguable that Pennsylvania law could apply, the plaintiff concedes in its Brief that the laws of Pennsylvania and Indiana are similar and

produce similar results. (Def.'s Mem. in Supp. at 3.)

5. See Note 3, *supra*.

that Rescuers was negligent in providing ink that it knew or should have known would both cause seal failures and contaminate the bone cement. PMC further contends that Rescuers knew the purpose for which the ink printed pouches would be used and knew that sterile conditions were critical.

■ Negligence theory protects interests related to safety or freedom from physical harm. *Bamberger & Feibleman v. Indianapolis Power & Light Company,* 665 N.E.2d 933, 938 (Ind.Ct.App.1996). *See* Martin J. McMahon, *Consequential loss of profits from injury to property as element of damages in products liability,* 89 A.L.R.4th 11 (1991); William K. Jones, *Products Causing Commercial Loss: The Ascendancy of Contract Over Tort,* 44 U.Miami L.Rev. 731 (1990). Rescuers contends that no recovery in tort is possible when premised on the failure of a product to perform as expected, where losses are solely economic. Contrary to Rescuers' position, Indiana law does recognize recovery of such losses in a tort action. *See Serletic v. Noel,* 700 N.E.2d 1159, 1161 (Ind.Ct.App.1998); *Bamberger,* 665 N.E.2d 933, 937. When a product fails to perform as expected and such failure causes personal injury or physical harm to property *other than the product itself* economic losses may be recoverable. *Bamberger, supra* at 937 (emphasis added); *Martin Rispens & Son v. Hall Farms, Inc.,* 621 N.E.2d 1078 (Ind.1993), *reh'g denied.*

■ In an attempt to get around the language in *Bamberger,* Rescuers argues that the only damage or loss was to the product itself. This is also incorrect. The product, itself was the PMC pouch. Rescuers supplied ink to PMC that PMC used to print on sealable bag type "pouches." These pouches were then sent by PMC to Zimmer where bone cement was placed in the pouches and the opening was sealed. This bone cement had to be kept in a sterile environment. The ink allegedly caused a loss of sterility in two ways. First, the seals did not always hold which allowed other contaminants to enter the pouch. Secondly, an "anti-scuff" agent in the ink allegedly directly contaminated the bone cement. This constituted "physical harm to property other than the product (i.e. the pouches) itself." As a result of this contamination, all of the bone cement was recalled and Zimmer's business was damaged. While no Indiana cases are directly on point it is this Court's opinion that the "economic loss doctrine" does not apply to the facts in this case.[6] Moreover, negligence is rarely appropriate for summary judgment. *Lucas v. Dorsey,* 609 N.E.2d 1191 (Ind.Ct.App.1993), *trans. denied.*

■ Issues of fact remain as to whether Rescuers had knowledge of the need to maintain sterility and whether it was negligent in recommending its Phase 28 ink for use on the Zimmer pouches. Accordingly, the Court finds that summary judgment is not appropriate.

## II. Count II—Strict Liability

PMC asserts that Rescuers ink was provided in an unreasonably dangerous condition because Rescuers knew or should have known that an ink containing silicone

6. In researching case law this Court notes that states with similar statutes that have addressed cases similar to this one have refused to prohibit negligence claims. *Compare, e.g., Blommer Chocolate Co. v. Bongards Creameries, Inc.,* 635 F.Supp. 911 (N.D.Ill.1985) (sustaining negligence claim where contaminated ingredient led to contamination of chocolates and chocolate processing facilities); *Ales–Peratis Foods Int'l, Inc. v. American Can Co.,* 164 Cal.App.3d 277, 209 Cal.Rptr. 917 (1985) (upheld negligence claim when packer sustained substantial financial losses when it was unable to package quantities of abalone as a result of defective cans because the cans, if used, would have posed hazards to the consumers); *National Can Corp. v. Whittaker Corp.,* 505 F.Supp. 147 (N.D.Ill.1981) (negligence for damage to contents of cans); *Le-Sueur Creamery, Inc. v. Haskon, Inc.,* 660 F.2d 342 (8th Cir.1981) (cheesemaker could recover in negligence for lost profits caused by excessive heat from pasteurizer that caused property damage to milk in addition to decrease in cheese yield), *cert. denied.*

anti-scuff agents would contaminate the bone product and would cause seals to fail. Furthermore, PMC claims that Rescuers never warned it of any potential hazard. Rescuers counters that PMC cannot maintain a claim in strict liability because it has not suffered "physical harm," and because the ink was not defective or unreasonably dangerous.

█ Strict product liability actions in Indiana are governed by the Indiana Product Liability Act (Act). Ind.Code §§ 33–1–1.5–1 to 33–1–1.5–8. A claim for strict liability requires proof of the following elements: (1) that the seller is engaged in the business of selling such a product; (2) that the product was defective and unreasonably dangerous; (3) that the defect existed at the time the product left the defendant's control; (4) that the product was expected to and did reach the consumer without substantial change in its condition; and (5) that the plaintiff's injuries were proximately caused by the defective product.[7] *See* Ind.Code § 33–1–1.5–3(a); *Welch v. Scripto– Tokai Corp.*, 651 N.E.2d 810, 814 (Ind. Ct.App.1995), *reh'g denied.* The only issue currently in dispute for purposes of this motion is whether the ink was defective and unreasonably dangerous. The condition that the product is defective focuses on the product itself, while the requirement that the product is unreasonably dangerous centers on the reasonable expectations of the consumer. *Id.* Both elements must exist for liability to attach. *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 685 (Ind.Ct.App.1991), *trans. denied.*

### A. Defect

█ Defendant asks this Court to accept a narrow interpretation of the word "defect" and insists that PMC cannot show the ink was defective. A defect is not limited to an actual flaw. According to Indiana law, a product is "defective" if it is in a condition:

> (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and

> (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

Ind.Code § 33–1–1.5–2.5. Reasonably expectable use like reasonable care involves questions concerning the ordinary prudent person, or in the case of products liability the ordinary prudent consumer. The manner of use required to establish "reasonably expectable use" under the circumstances of each case is a matter peculiarly within the province of the jury. *Short by Southerland v. Estwing Mfg. Corp.*, 634 N.E.2d 798 (Ind.Ct.App.1994), *trans. denied. See Lovely v. Keele*, 166 Ind.App. 106, 333 N.E.2d 866 (1975) (determination of what conduct constitutes reasonable care is normally a question for the jury).

A product is also defective if the seller fails to give reasonable warnings or instructions to the consumer. Ind.Code § 33–1–1.5–2.5. PMC's main contention is that Rescuers failed to warn it about the properties of the ink. In a strict liability case based on failure to warn, the threshold question is whether the seller "knew or had reason to know that the product was likely to be dangerous when used in a foreseeable manner." *Peters v. Judd Drugs, Inc.*, 602 N.E.2d 162, 164–65 (Ind. Ct.App.1992), *trans. denied; Hinkle v. Niehaus Lumber Co.*, 525 N.E.2d 1243 (Ind.1988). In Indiana, the adequacy of a warning with respect to a strict liability claim is governed by the same concepts as a negligence claim. *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1166 (Ind.Ct.App. 1988), *trans. denied.* As this Court dis-

---

7. Indiana Code §§ 33–1–1.5–1 through 33–1–1.5–8, Indiana Strict Product Liability Act, subjects sellers of defective products to liability for physical harm caused by that product to user or consumer or to his property. "Physi-cal harm" is defined as "bodily injury, death, loss of services, and rights arising from any such injuries, as well as sudden, major damage to property or economic losses from such damage."

cussed *supra*, issues of fact remain regarding whether Rescuers had knowledge of the need to maintain sterility and whether it knew or should have known the Phase 28 ink could cause seal failures or that the anti-scuff agent could cause contamination. These issues fall squarely within the province of a jury.

### B. Unreasonably Dangerous

■ The term "unreasonably dangerous" is defined as "any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind.Code § 33–1–1.5.2(7); *Scripto–Tokai*, 651 N.E.2d at 814. The fact that a product caused an injury does not *ipso facto* mean that the product is unreasonably dangerous. Whether a product is in an unreasonably dangerous defective condition is a question of fact under Indiana law. *See Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562 (Ind.Ct. App.1986); *Corbin v. Coleco Indus., Inc.*, (7th Cir.1984); *Gilbert v. Stone City Const. Co., Inc.*, 171 Ind.App. 418, 357 N.E.2d 738 (1976). The law thus creates an objective standard, under which the court must take into account "the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users." *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 440–41 (Ind.1990); Cox, 580 N.E.2d 679, 685; *Moss v. Crosman Corp.*, 136 F.3d 1169 (7th Cir.1998).

As stated *supra*, the adequacy of warnings is classically a question of fact reserved to the trier of fact and, therefore, usually an inappropriate matter for summary judgement. *Jarrell*, 528 N.E.2d at 1162. *See also, Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct.App.1997), *trans. denied* 698 N.E.2d 1195 (Ind.1998); *York v. Union Carbide Corp.*, 586 N.E.2d 861, 869 (Ind.Ct.App. 1992). At this stage evidence must be construed in favor of the nonmovant, and any doubt about the existence of a genuine issue of material fact must be resolved against the moving party. *Peters*, 602 N.E.2d 162, 164. Issues of fact remain as to Rescuers' knowledge of the ink's potential to cause the type of problem that occurred and as to the adequacy of any warning supplied, therefore, summary judgment is not appropriate.

### C. Physical Harm

■ Rescuers claims that PMC has suffered not "physical harm" as required by the Act. Physical harm is defined at I.C. § 34–6–2–105 which provides in relevant part:

(a) "Physical harm", for purposes of IC 34–20, means bodily injury, death, loss of services, and rights arising from any such injuries, as well as sudden, major damage to property.

(b) The term does not include gradually evolving damage to property or economic losses from such damage.

This Court has already found that "damage to property" occurred. The remaining issue of whether the property damage was "sudden, major damage" is an issue of fact that requires such weighing, balancing and assessing the underlying facts. *See Reed v. Central Soya Co., Inc.*, 644 N.E.2d 84, 86 (Ind.1994) (issue of fact regarding property damage precludes summary judgment on product liability claims). Rescuers asserts that the case of *Mac's Eggs, Inc. v. Rite–Way Agri Distributors, Inc.*, 656 F.Supp. 720 (N.D.Ind.1986), is analogous to this case. This Court believes differently. In *Mac's Eggs*, applying Indiana law, the district court found that a poultry farmer's loss of poultry due to allegedly defective poultry cage equipment did not constitute "physical harm" because the loss of poultry was sustained over a period of months, and presented no risk of sudden loss to a substantial amount of the farmer's property at any given time. *Id.* *Compare, Tony Spychalla Farms v. Hopkins Agricultural Chem. Co.*, 151 Wis.2d 431, 444 N.W.2d 743 (1989) (found strict liability for damaged agricultural product),

*review denied* 446 N.W.2d 285 (Wis.1989); *U.S. Home Corp. v. George W. Kennedy Constr. Co.*, 565 F.Supp. 67 (N.D.Ill.1983) (found strict liability for damage to sewer system). This case is significantly different from *Mac's Eggs*. In this case, although PMC discovered the contamination after several months, the contamination caused "sudden, major damage" in that once the "defect" was discovered all of the bone cement had to be recalled in order to prevent possible wide scale physical injury. The contaminated bone cement was a total loss.

Looking at all the facts and circumstances peculiar to this particular case it is this Court's opinion that fact issues remain, including but not limited to, whether Rescuers knew 1) its Phase 28 ink was used on poly; 2) its Phase 28 ink was not proper for such use; and 3) that sterility was critical. Accordingly, summary judgment is not proper.

### III. Warranty Issues

 Under the Uniform Commercial Code as enacted in Indiana, IC 26–1–1–101 to –10–104, there are two implied warranties, that of merchantability and that of fitness for a particular purpose. *Richards v. Goerg Boat and Motors, Inc.*, 179 Ind. App. 102, 384 N.E.2d 1084, 1090 (1979), *trans. denied.* PMC claims Rescuers breached both of these. Rescuers asserts that summary judgment is proper as to all warranty claims because it specifically and openly disclaimed all warranties, express or implied, in several ways. Under Indiana law, a disclaimer must be clear, conspicuous, conscionable, and consciously bargained for, and, in the case of an implied warranty of fitness for a particular purpose, the disclaimer must be in writing. Ind.Code § 26–1–2–316(2) (1976). *See also* Ind.Code § 26–1–2–317(c) (1976); *Woodruff v. Clark County Farm Bureau Co–op. Ass'n*, 153 Ind.App. 31, 286 N.E.2d 188 (1972). Furthermore, disclaimers are expressly construed against the seller.

*Karczewski v. Ford Motor Co.*, 382 F.Supp. 1346 (N.D.Ind.1974), *aff'd* 515 F.2d 511 (7th Cir.1975); *Woodruff*, 153 Ind.App. 31, 286 N.E.2d 188.

### A. Count III—U.C.C. Breach of Implied Warranty

 PMC claims Rescuers breached an implied warranty that the ink was of merchantable quality. An implied warranty of merchantability is imposed by operation of law for the protection of the buyer. *Frantz v. Cantrell*, 711 N.E.2d 856 (Ind.Ct. App.1999). To exclude an implied warranty of merchantability, typically the disclaimer must contain the word "merchantability." *Travel Craft v. Wilhelm Mende GmbH & Co.*, 552 N.E.2d 443, 444 (Ind. 1990); *Martin Rispens*, 621 N.E.2d 1078, 1084. In the present case, Rescuers provided three alleged disclaimers. The first was on the label of the container holding the ink. This disclaimer does not meet the requirement of conspicuousness. It is in very small type that is difficult to read. It is not set apart in a manner that calls attention to it. This is exactly the type of disclaimer that the U.C.C. holds insufficient. *See generally, Greenspun v. American Adhesives, Inc.*, 320 F.Supp. 442 (D.C.Pa.1970) (implied warranty disclaimer affixed to goods sold insufficient); *Victor v. Mammana*, 101 Misc.2d 954, 422 N.Y.S.2d 350 (N.Y.1979) (warranty disclaimer on can of wall-tile adhesive not sufficient); *Borden Inc. v. Advent Ink Co.*, 701 A.2d 255 (Pa.Super.Ct.1997) (disclaimer on drum labels of black dispersion which ink manufacturer purchased from supplier not conspicuous), *appeal denied* 555 Pa. 725, 725 A.2d 178 (1998) [8]. Additionally, it does not mention "merchantability." *Martin Rispens*, 621 N.E.2d 1078 (held as "not conspicuous" attempted disclaimer of implied warranty of merchantability did not mention merchantability and appeared on reverse side of purchase order that did not require signature); *accord*

---

**8.** Similar to the *Woodruff* court this Court notes that, while sister states' opinions are only persuasive, those states are governed by the U.C.C. and therefore apply similar rationale when evaluating a warranty disclaimer. 153 Ind.App. 31, 286 N.E.2d 188, 193.

*Woodruff,* 153 Ind.App. 31, 286 N.E.2d 188. *See also Agrarian Grain Co. v. Meeker,* 526 N.E.2d 1189 (Ind.Ct.App. 1988).

 The second alleged disclaimer was on a "Technical Data Sheet" apparently supplied to PMC with the ink. Indiana law frowns on boilerplate limitations of liability in an invoice or other routine (and typically unread) documents. *See generally, McGraw–Edison Co. v. Northeastern Rural Elec. Membership Corp.,* 678 N.E.2d 1120, 1123 (Ind.1997). *See also* Ind.Code § 33–1–1–5.4. Furthermore, the appearance of an implied warranty disclaimer within a document delivered to the buyer only after the sale has been consummated has usually been held to render the disclaimer ineffective on the theory that it represents a unilateral attempt by the seller to avoid warranty obligations which have already arisen. *See Karczewski,* 382 F.Supp. 1346 (that buyer of automobile was never contractually bound by contents of automobile manufacturer's warranty booklet in any explicit sense was enough to defeat manufacturer's assertion that claim of buyer based on implied warranty failed because of written disclaimers in the booklet). *See e.g. In re Eagle–Picher Industries, Inc.,* 181 B.R. 51 (Bankr.S.D.Ohio 1995) (denied summary judgment on warranty packed with each battery shipped to buyer because record did not show that transmission of warranty was reasonably calculated to make responsible individual at buyer aware of it); *Marion Power Shovel Co. v. Huntsman,* 246 Ark. 152, 437 S.W.2d 784 (1969) (warranty contained in "operation and maintenance manual" sent to buyer with the goods not sufficiently conspicuous); *Holcomb v. Cessna Aircraft Co.,* 439 F.2d 1150 (5th Cir.1971) (held disclaimer inconspicuous where it was included in a factory warranty and the document was printed in the same size type throughout), *cert denied.*

In this case there is no evidence of how PMC received this sheet or who, if anyone, actually saw or read it. Moreover, it is a one page sheet printed in all the same type that describes Phase 28 ink. It is not titled "warranty" or "warning." It has several bullet points noted with asterisks. (e.g., *HIGH QUALITY, *FAST DRYING) The alleged disclaimer is labeled " *IMPORTANT NOTICE" and is printed in exactly the same type-size, style and color as the entire page. Finally, the alleged disclaimer is at the bottom of the page and is not set apart in any conspicuous manner.[9] This is the type of disclaimer that the law routinely holds insufficient.

 The final disclaimer was contained in a catalog of Rescuers' products. It is on a catalog page numbered A–3. The page is titled "Estimating Ink Coverage." The disclaimer is the last paragraph on the page and, once again, is in exactly the same type-size, style and color as the rest of the page. Courts have routinely held this is insufficient. Whether the ink was of merchantable quality is a question of fact. Defendant's attempted disclaimers are insufficient to warrant summary judgment.

**B. Count IV—Breach of Implied Warranty for Particular Purpose**

 PMC also asserts that Rescuers knew the particular purpose for which its ink was to be used (i.e. sterile pouches to contain bone cement) and that PMC relied upon Rescuers' skill and judgment to select the appropriate ink. PMC charges that Rescuers breached a warranty of fitness for particular purpose when it supplied the Phase 28 ink. "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer

---

9. This "important notice" states:
 Arcar recommends pre-testing this product on your materials before running any production runs. Arcar Graphics, Inc. makes no warranty, expressed or implied concern-
 ing the use or results of our materials. Full-scale testing and end product performance are the responsibility of the user. All risk and liability is assumed by the user.

which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." U.C.C. § 2–315; *R. Clinton Constr. Co. v. Bryant & Reaves, Inc.*, 442 F.Supp. 838 (N.D.Miss.1977). In action under U.C.C. § 2–315 for breach of implied warranty of fitness for particular purpose, buyer must show: (1) that seller must have had reason to know buyer's particular purpose, (2) that seller must have had reason to believe buyer was relying on seller's skill and judgment, and (3) that buyer in fact had relied on seller's skill and judgment. Ind.Code § 26–1–2–315. *See also Wisconsin Electric Power Co. v. Zallea Bros., Inc.*, 443 F.Supp. 946 (E.D.Wis.1978) (applying Wis. law), *aff'd* 606 F.2d 697 (7th Cir.1979). The whole point of an implied warranty of fitness for a particular purpose is that the product sold by the seller to the buyer will be suitable for the "specific purpose" which the buyer has, and any similar product which the seller may sell to the buyer which is not so suited will breach that warranty of fitness for the particular purpose. *Recreatives, Inc. v. Myers*, 67 Wis.2d 255, 226 N.W.2d 474 (1975); *H.B. Fuller Co. v. Kinetic Sys., Inc.*, 932 F.2d 681, 689 (7th Cir.1991).

■ Rescuers only argument in defense is that PMC failed to provide timely notice of the alleged breach. Section 26–1–2–607(3)(a) of the Indiana Code provides that "the buyer must, within a reasonable time after he discovers or should have discovered any breach, notify the seller or be barred from any remedy." What is a "reasonable time" within the purview of this section depends upon particular circumstances, including the existence of a course of dealing between the' buyer and seller. *Courtesy Enter., Inc. v. Richards Labs.*, 457 N.E.2d 572 (Ind.Ct.App.1983).[10]

■ There is a conflict within the case law whether notice requires notice of the factual circumstances sufficient for the seller to determine that the buyer has grounds for a claim of breach (the "lenient standard") or requires specific notice that the buyer in fact believes the problem constitutes a breach of warranty (the "strict standard"). This conflict is the result of the conflicting guidance provided by Comment 4 to § 2–607, which counsels both that "the content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched, and that '[t]he notification which saves the buyer's rights ... need only be such as informs the seller that the transaction is claimed to involve a breach.'" George F. Hammond, *Note, Notification of Breach Under Uniform Commercial Code Section 2–607(3)(a): A Conflict, A Resolution,* 70 Cornell L.Rev. 525, 528–29 (1985). The Supreme Court of Indiana has not addressed which standard applies under Ind.Code § 26–1–2–607(3)(a). The Court of Appeals of Indiana, however, applies the lenient standard. *Advantage Eng'g, Inc. v. Burks Pumps, Inc.*, 28 F.3d 1216, 1994 WL 317126 (7th Cir.1994), *reh'g denied. See e.g., B & B Paint Corp. v. Shrock Mfg., Inc.*, 568 N.E.2d 1017 (Ind.Ct.App.1991), *trans. denied; Agrarian Grain*, 526 N.E.2d 1189; *Auto–Teria, Inc. v. Ahern*, 170 Ind.App. 84, 352 N.E.2d 774 (1976). Thus, this Court also applies the lenient standard.

10. For example: A buyer's verbal notice of defects in a machine to the selling agent, who, acting for the seller, undertook to remedy them, was sufficient, under a contract requiring written notice to seller, not to selling agent. *Port Huron Engine & Thresher Co. v. Smith,* 21 Ind.App. 233, 52 N.E. 106 (1898). Where one of the principal purposes for purchase of farm combine was for the combining of soybeans, a special attachment for such combining was included in the sale, and no opportunity existed for trying combine with attachment on soybeans until crop ripened, notice that machine was not giving satisfactory service with reference to soybeans, given within three days of first attempted use for combining a crop of soybeans was timely, notwithstanding that machine had been put to other uses previously. *Schaefer v. Fiedler,* 116 Ind.App. 226, 63 N.E.2d 310 (1945).

■ Rescuers claims it began supplying ink in July, 1994. PMC printed pouches and began shipping to Zimmer in December, 1994. PMC first learned of the problems with the pouches in April, 1995 and asked Rescuers to change its ink. (*See* PMC letter dated April 13, 1995.) Rescuers supplied a listing of the chemicals contained in Phase 28 ink in a letter dated April 24, 1995. PMC later learned the extent of the contamination and that all the pouches were recalled. In February 1996, PMC notified Rescuers of an alleged breach and requested damages. (Def.'s Mem. in Supp. at 15.) Zimmer filed suit against PMC in August 1997. PMC filed a third-party complaint against Rescuers in March, 1998. Based on the circumstances specific to this case, this Court finds that PMC gave timely and sufficient notice to Rescuers within a reasonable time as required by Indiana law.[11]

### C. Express Warranties

■ PMC does not explicitly assert an express warranty claim in its Complaint. However, in its Memorandum of Law in response to Rescuers' motion, PMC claims that rescuers provided an express warranty as to the suitability of the Phase 28 ink for a particular job. (Plf.'s Mem. in Resp. at 4–5.) All representations concerning the ink were oral. Therefore, PMC asserts that the existence of an express warranty is an issue of fact for the jury. *See Woodruff,* 153 Ind.App. 31, 286 N.E.2d 188, 199. PMC also claims that under Indiana law an oral express warranty cannot be contradicted by a written disclaimer. *See Carpetland U.S.A. v. Payne,* 536 N.E.2d 306, n. 1 (Ind.Ct.App.1989) (discussing the Parole Evidence Rule). Rescuers asserts the same defenses as discussed *supra.*

"Express warranties by the seller are created as follows: any affirmation of fact . . . made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation." U.C.C. § 2–313(1)(a); *Gorman v. Saf–T–Mate, Inc.,* 513 F.Supp. 1028 (N.D.Ind.1981). General statements to the effect that goods are "the best," are "of good quality," or will "last a lifetime" and be "in perfect condition" are generally regarded as expressions of seller's opinion or "puffing" of his wares and do not create an express warranty. *Royal Business Machines, Inc. v. Lorraine Corp.,* 633 F.2d 34 (7th Cir.1980). In this case, PMC asserts that Rescuers made specific representations as to the suitability of its ink.[12] Because no written agreement exists there is no issue of law as to whether Rescuers

11. *Compare Piezo Crystal Co. v. Uddeholm Corp.,* 870 F.Supp. 589 (M.D.Pa.1994) (applying Pa. law) (facts did not compel conclusion that, as matter of law, buyer should have reasonably discovered alleged source of its problems prior to 1990; although tags on steel delivered in 1987 or 1988 identified it as different grade steel from that ordered, each order acknowledgment, work order, packing slip, and invoice generated by seller represented that grade of steel ordered was being delivered, differences between steel ordered and steel delivered could not be discerned by unaided visual inspection, and buyer's production problems did not appear consistently and thus hampered its efforts to investigate cause of problems); *First Sec. Mortgage Co. v. Goldmark Plastics Compounds, Inc.,* 862 F.Supp. 918 (E.D.N.Y.1994) (applying N.Y. law) (reasonable notice found since broker did not use plastic itself, and any defects would generally be discovered only when end-user actually used material, such that reasonable time to broker could be varying and could involve substantial periods of time); *Environmental Elements Corp. v. Mayer Pollock Steel Corp.,* 497 F.Supp. 58 (D.Md.1980) (notice of defects was within a reasonable time after it should have discovered the defects, although the buyer did not learn of the problem until approximately 9 months after delivery, where the defects were covered with paint and only external surfaces were visible, so that it was impossible to discover defects by visual inspection).

12. For example, compare *Wiseman v. Wolfe's Terre Haute Auto Auction, Inc.,* 459 N.E.2d 736 (Ind.Ct.App.1984) (trial court's finding in breach of warranty action that seller's statement that diesel truck was "road ready" was an express affirmation of fact essential to consummation of sale, and hence an express warranty, was not clearly erroneous).

breached any express warranty. *See Woodruff,* 153 Ind.App. 31, 286 N.E.2d 188, 198 (quoting *Regina Grape Prod. Co. v. Supreme Wine Co.,* 357 Mass. 631, 260 N.E.2d 219 (1970)). However, issues of fact remain regarding the existence of an express warranty and for the reasons previously discussed, the disclaimers are insufficient to warrant summary judgment.[13]

### IV. Count V—Breach of Contract

No written agreement between PMC and Rescuers exists. PMC relies on implied contract theory as evidenced by the general course of dealings between Rescuers and itself to show that a contract exists. Rescuers argues that because there was no written contract the Statute of Frauds applies and this claim is precluded. In the alternative, Rescuers argues that a letter it sent to PMC, dated April 24, 1994, is the sum total of the contract and therefore this court must strictly construe same. Both arguments lack merit.

▬ For a completed oral contract to come into being, the parties must agree to all terms of the contract. *Lakes and Rivers Transfer, a Div. of Jack Gray Transport, Inc. v. Rudolph Robinson Steel Co.,* 691 N.E.2d 1294 (Ind.Ct.App.1998); *Keating v. Burton,* 617 N.E.2d 588, 592 (Ind.Ct.App.1993), *trans. denied.* Furthermore, the terms of a contract not reduced to writing are a matter to be interpreted by the trier of fact. *Ballew v. Town of Clarksville,* 683 N.E.2d 636 (Ind. Ct.App.1997), *trans. denied* 698 N.E.2d 1182 (Ind.1998); *Tuthill Corp. Fill–Rite Div. v. Wolfe,* 451 N.E.2d 72, 77 (Ind.Ct. App.1983).

### A. Existence of a Contract

▬ To be valid, a contract need not be in writing, but in some circumstances may be partly in writing and partly oral, or solely oral. *Citizens Progress Co. v. James O. Held & Co.,* 438 N.E.2d 1016, 1021 (Ind.Ct.App.1982); *Sand Creek*

*Country Club, Ltd. v. CSO Architects, Inc.,* 582 N.E.2d 872 (Ind.Ct.App.1991). However, "the party urging the validity of a contract bears the onus of proving its existence." *Ochoa v. Ford,* 641 N.E.2d 1042, 1044 (Ind.Ct.App.1994). The record in this case indicates that PMC contacted Rescuers regarding ink. (Phillips Aff. ¶ 4.) PMC placed an order, by telephone, for Rescuers' ink. (Phillips Aff. ¶ 16.) Rescuers supplied the ink. (Phillips Aff. ¶ 12.) This Court determines as a matter of law that a contract existed between Rescuers and PMC. It is clearly evidenced by the course of dealings between the parties. The only question remaining is whether the contract was valid.

### B. Statute of Frauds

▬ Rescuers claims the Statute of Frauds precludes any contract with PMC. The purpose of the Statute of Frauds is to preclude fraudulent claims which would "probably arise when one person's word is pitted against another so as to open wide those ubiquitous floodgates of litigation." *Ohio Valley Plastics, Inc. v. National City Bank,* 687 N.E.2d 260, 263 (Ind.Ct.App. 1997) (quoting *Summerlot v. Summerlot,* 408 N.E.2d 820, 828 (Ind.Ct.App.1980)). *See also, Consolidated Servs., Inc. v. Key-Bank Nat'l Ass'n,* 185 F.3d 817, 823 (7th Cir.1999). First, under Indiana law, the Statute of Frauds does not apply when a promisor receives some consideration for his promise that provides him with a personal, immediate and pecuniary interest in the transaction. *Luson Intern. Distributors, Inc. v. Mitchell,* 939 F.2d 493 (7th Cir.1991). In this case, Rescuers does not argue lack of consideration, and based on the record the Court assumes that consideration was paid and the contract was performed.

▬ Additionally, "Where no time is fixed for the performance of a contract; or where it is to be performed by a certain

---

**13.** Questions regarding the existence of express warranties, where the only evidence is in parol, are for the jury to determine. *See generally,* Woodruff, 153 Ind.App. 31, 286 N.E.2d at 198 (citing a list of cases holding same).

day (the right to perform it sooner not being precluded); or where the performance depends upon a contingency which may or may not happen within a year, the contract is not within § 1 of the Statute." *Purity Maid Prod. Co. v. American Bank & Trust Co.*, 105 Ind.App. 541, 14 N.E.2d 755, 758 (1938) (citations omitted). *See also Wright Mfg. Corp. v. Scott*, 172 Ind. App. 154, 360 N.E.2d 2 (1977). Moreover, considering the exchange of reports regarding ink tests, the letters between the parties, as well as the actual shipment of ink, there is enough indication of the terms of the parties' contract to satisfy the U.C.C.'s not very demanding Statute of Frauds. U.C.C. § 2–201; *See Monetti, S.P.A. v.. Anchor Hocking Corp.*, 931 F.2d 1178, 1182–83 (7th Cir.1991) (finding similarly); *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227 (7th Cir.1995) (written price quotations and purchase order provided enough indication of terms of sales contract).

### C. The Letter

■ Rescuers alternatively argues that if a contract did exist, its sole terms are contained in its April 24, 1994 letter to PMC. This Court believes otherwise. The April 24 letter is simply a breakdown list of the components in Phase 28 ink and was for informational purposes. There are no terms or conditions contained therein and no reference to supply, quantity, shipping, cost or any other items giving rise to the inference of the terms of a contract.

### V. Expert Witness

In a final attempt to obtain summary judgment Rescuers argues that PMC has no expert witness and cannot meet its burden. (Def.'s Mem. in Supp. at 29.) Additionally, Rescuers claims that because PMC has not yet disclosed an expert, pursuant to Rule 26(a)(2)(B) it should be precluded from offering any expert testimony during trial. The applicable Federal Rule of Civil Procedure states:

(2) Disclosure of Expert Testimony.

(B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Such disclosure is to be made when directed by the Court, and at least ninety (90) days before trial.

Based on all parties' consent, this case was originally assigned to a Magistrate Judge. It was only recently returned to this Court due to the Magistrate's untimely death. No discovery deadlines or trial date have been set. It is preposterous for defendant to claim PMC has somehow violated Rule 26 in this case. Moreover, even if PMC fails to provide an expert prior to trial its claims may still be proven. There is no burden on a plaintiff to prove a specific defect by an expert witness as distinguished from other proof. The fact of a malfunction and also of a defect may be proven by direct or circumstantial evidence. *Holcomb*, 439 F.2d 1150, 1155. See also the discussion in *Alman Brothers Farms & Feed Mill, Inc. v. Diamond Labs., Inc.*, 437 F.2d 1295 (5 Cir.1971), on the dimension of the requirement in a products liability case that plaintiff prove a specific defect in the product causing him injury.

### CONCLUSION

For the preceding reasons, Rescuers' Motion for Summary Judgment is hereby **DENIED** as to all Counts. Additionally, this Court holds as a matter of law that a contract existed between the parties and that all warranty disclaimers are invalid. Issues of fact remain regarding negligence, strict liability and breach of contract.

IT IS SO ORDERED.